## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARK ANTHONY SPELL; LIFE TABERNACLE CHURCH, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JOHN BEL EDWARDS, in his individual capacity and his official capacity as Governor of the State of Louisiana; DAVID BARROW, in his individual capacity and his official capacity as Mayor of Central City, Louisiana; ROGER CORCORAN, in his individual capacity and official capacity as Chief of Police of Central City, Louisiana; SHARON WESTON BROOME, in her individual capacity and official capacity as Mayor of Baton Rouge, Louisiana; SID GAUTREAUX, individually and in his official capacity as Sheriff of East Baton Rouge Parish, Louisiana; FRED CRIFASI, individually and in his official capacity as Judge of the 19th Judicial District Court, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. _____ |
| Defendants. | ) | |

_____

### PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT
_____

COME NOW the Plaintiffs, Pastor Tony Spell and Life Tabernacle Church,

and file this complaint against the Defendants, Governor John Bel Edwards,

Central City Mayor David Barrow, Central City Chief of Police Roger Corchoran, Baton Rouge Mayor Sharon Weston Broome, East Baton Rouge Parish Sheriff Sid Gautreaux, and Judge Fred Crifasi of the Louisiana 19th Judicial District Court, and show the following:

## INTRODUCTION

1.    This action arises out of (1) unconstitutional restrictions on the religious liberty of Pastor Mark Anthony ("Tony") Spell and Life Tabernacle Church and (2) unconstitutional punishments of Pastor Spell for exercising his God-given and constitutionally protected rights.

2.    The Plaintiffs seek to have the restrictions against them enjoined as unconstitutional, and Pastor Spell seeks to be compensated for the deprivation of his constitutional rights.

## PARTIES

3.    Pastor Spell resides in Central City, Louisiana and Baton Rouge, Louisiana. He pastors Life Tabernacle Church.

4.    Life Tabernacle Church is located in Central City, Louisiana, and Baton Rouge, Louisiana.

5.    Defendant John Bel Edwards is the Governor of Louisiana and resides in Baton Rouge, Louisiana.

6.    Defendant David Barrow is the Mayor of Central City, Louisiana.

2

7.   Defendant Roger Corcoran is the Chief of Police for Central City, Louisiana.

8.   Defendant Sharon Weston Broome is the Mayor-President of the City of Baton Rouge, Parish of East Baton Rouge Louisiana.

9.   Defendant Sid Gautreaux is the Sheriff of East Baton Rouge Parish, Louisiana.

10.  Defendant Fred Crifasi is a judge of the 19th Judicial District Court, which is located at 300 North Boulevard, Baton Rouge, Louisiana 70801.

## JURISDICTION AND VENUE

11.  Plaintiffs seek redress for federal constitutional violations pursuant to 42 U.S.C. § 1983. This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

12.  Venue is proper in this court pursuant to 28 U.S.C. § 1391 (b) (1) & (2).

13.  This Court has supplemental jurisdiction to grant relief on state-law claims pursuant to 28 U.S.C. § 1367.

## FACTUAL HISTORY

14.  Pastor Tony Spell is an ordained minister of the Christian faith and is the minister to Life Tabernacle Church located at 9323 Hooper Road, Baton Rouge (Central City), Louisiana.

15.   Beginning on March 11, 2020, Governor John Bel Edwards issued a series
      of Executive Orders addressing the Coronavirus epidemic. On March 13 and
      thereafter, said orders began to address church "gatherings."[1]

16.   Proclamation Number 41 JBE 2020 is entitled "State of Emergency For
      COVID-19 Extension of Emergency Provisions." Section 2(A) of that order
      prohibits "all gatherings of 10 people or more."

17.   Life Tabernacle Church is a large assembly of more than 2,000 individuals
      that practice strict adherence to the Holy Bible and Christian principles.[2]
      Those principles include assembling for church in person, which is based
      partially on the following Bible verses:[3]

      a.   "not forsaking the assembling of ourselves together, as the manner of
           some is; but exhorting one another: and so much the more, as ye see
           the day approaching," Hebrews 10:25

      b.   "I will declare thy name unto my brethren: in the midst of the
           congregation will I praise thee," Psalm 22:22.

      c.   "My praise shall be of thee in the great congregation: I will pay my
           vows before them that fear him," Psalm 22:25.

---

[1] See copies of Governor's orders, attached as Exhibit "A"
[2] For the beliefs of Pastor Spell and Life Tabernacle,as well as the factual history cited herein, see his attached Affidavit as Exhibit "B"
[3] All Bible verses quoted herein are from the King James Version unless otherwise noted.

   d.  "Praise ye the Lord. I will praise the Lord with my whole heart, in the assembly of the upright, and in the congregation," Psalm 111:1.

   e.  "Where two or three are gathered together in my name, there am I in the midst of them," Matthew 18:20.

   f.  Throughout the Scriptures, not only did the Lord teach in the Synagogues, but His disciples did as well. Acts 5:20-21 records a time when the angel of the Lord "directed" Peter and John to "Go stand and speak in the temple to the people all the words of this life." And when Peter and the other apostles were told not to "teach in this name," they boldly declared, "We ought to obey God rather than men." (Acts 5:28-29.)

18.   Pastor Spell and Life Tabernacle Church believe that the Bible is the Word of God and that they must conduct church in accordance with the Bible's commandments.

19.   Pastor Spell and Life Tabernacle Church sincerely believe that the Bible commands them to hold church services in person.

20.   Pastor Spell also believes that it is his duty to lay hands on the sick and pray for them so that they may become well. *See* James 5:14-15 ("Is any sick among you? let him call for the elders of the church; and let them pray over him, anointing him with oil in the name of the Lord: And the prayer of faith

shall save the sick, and the Lord shall raise him up; and if he have committed sins, they shall be forgiven him.") Life Tabernacle Church also shares this belief.

21.   The Plaintiffs believe that without assembly, the laying on of hands for prayer and healing, the holy communion, and the love offering have lost their meaning unless done in public gathering.

22.   On Sunday, March 15, two days after the Governor's order of March 13, Life Tabernacle remained open.

23.   Shortly thereafter on March 17, Chief Fire Marshal Butch Browning visited Pastor Spell's home and advised Pastor Spell that he was relaying a message from  Governor Edwards to Spell to discontinue services.

24.   On March 24, Defendant Sheriff Gautreaux personally visited with Pastor Spell, and threatened Pastor Spell with arrest if he continued holding church assembly.

25.   During this period, two church buses were vandalized.  Pastor Spell personally reported the vandalism to the East Baton Rouge Parish Sheriff's office, and the deputies to whom he spoke declined to appear and take a report, but took a report by telephone and said they would not be able to come out for a further investigation, until Pastor Spell  walked from his premises to where the buses were located on  the Church property to

investigate, at which time several Sheriff's deputies appeared and then conducted a minimal investigation of the vandalism. On information and belief, no further investigation has been made.

26. On information and belief, Pastor Spell's telephone was "tapped" and being monitored. Cameras were installed across the road from the Church and Pastor Spell's personal residence-across from his dining room window-- to view those coming and going. Agents of law enforcement followed Pastor Spell everywhere he travelled.

27. Members of Life Tabernacle urged by local officials, to include Governor Edwards and Mayor Sharon Weston Broome, on local media not to attend church services. On information and belief, several members of Life Tabernacle were subsequently terminated from their jobs for their refusal to discontinue attendance at services.

28. On March 31, Pastor Spell was arrested by Defendant Roger Corcoran and issued six misdemeanor summonses for violation of Governor Edwards's Emergency Orders on six occasions, with each citation punishable by a fine of up to $500 and up to 90 days in jail.[4]

---

[4] See Bills of Information issued April 1, 2020, in the case "State of Louisiana v. Mark Anthony Spell, No.DC-20-01764, Sec. 4, 19th Judicial District Court, State of Louisiana, attached as Exhibit "C"

29.    Chief of Police Roger Corcoran and others publicly and with intent to disparage Pastor Spell's reputation used contemptuous language on public media with regard to his principled stand.

30.    On Wednesday, April 8, after church service the previous night, the water supply to Life Tabernacle was cut off without warning. After protests from the congregation to the Water Board of Baton Rouge, the Baton Rouge Water Company came to the church and restored service.

31.    Despite repeated complaints by members of Life Tabernacle regarding a lone protester who stood on the shoulder of the road in front of the church for weeks making vulgar gestures and obscene remarks to women and children of Pastor Spell's congregation, and who was clearly guilty of a traffic law infraction, law enforcement did nothing to enforce the laws regarding remaining after being forbidden or illegal parking.

32.    During constant video surveillance by government officials or others acting with their permission, Pastor Spell was recorded backing up his bus in the direction of the lone "protestor" on his property.  Defendant Roger Corcoran used that video to arrest and charge Pastor Spell with aggravated assault and improper backing.  Pastor was arrested, placed in jail, and thereafter released upon payment of $5,175 paid by his wife for bail.

33.   On Thursday, April 24, Pastor Spell, accompanied by Attorney Joe Long, met with District Court Judge Fred Crifasi in his courtroom for nearly 1.5 hours in a court ordered "status conference" regarding a "special condition of bond" placed upon Pastor Spell after his arrest.

34.   During that official status conference, Judge Crifasi warned Pastor Spell of "preaching to your assembly" in contradiction of the Governor's orders. Specifically, Judge Crifasi told Pastor Spell orally, "You can't preach to your church. That's prohibited."

35.   Judge Crifasi also told him, "You can't have more than ten persons around you at any time. You're the tenth person."

36.   When Long objected that this was not the "least restrictive means" because retailers did not have to abide by the same restrictions, Judge Crifasi said, "We're not here to argue that."

37.   On Friday, April 24, prior to the Sunday service, Pastor Spell was issued an ankle bracelet and placed on house arrest by Defendant Roger Corcoran and other members of the Central Police Department for violation of the special condition of bond in which he was restricted from violation of the Governor's Emergency Orders to include "preaching to your assembly."

38.   Pastor Spell was advised by Central Police Chief Roger Corcoran that upon exit of his home, he would be arrested.

39.    On information and belief, the special condition of bond and issuance of ankle bracelet had nothing to do with the assault charge before Judge Crifasi, as the substantive charges regarding the violation of Governor Bell's orders were previously pending before another section of the 19th Judicial District Court, and were yet to be litigated.

40.    On Sunday, April 26, Pastor Spell followed his religious conviction and preached to his congregation.

41.    Subsequently, Judge Crifasi  threatened Pastor Spell with a $25,000 increase in bail, but Pastor Spell refused to be coerced,  and Judge Crifasi decided not to increase the amount of cash bail.

42.    After Judge Crifasi deemed Pastor Spell to be a threat to the jail population, he declined to enforce either a threat or a fine against Pastor Spell until such time as the Court is opened for hearings.  Judge Crifasi advised that at such time the issue of contempt and revocation of bond would be addressed, presumably putting Pastor Spell's liberty once again at issue.[5]

## FEDERAL CLAIMS

## Count I: Free Exercise of Religion—Federal Constitution

---

[5] See Order signed by Judge Fred T. Crifasi dated April 27, 2020 in the case, "State of Louisiana v. Mark Anthony Spell, Number J-2000197359, Section I, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, attached as Exhibit "D."

43.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

44.    The First Amendment's Free Exercise Clause, incorporated and made applicable to state and local governments by the Fourteenth Amendment to the United States Constitution, prohibits Defendants from abridging the free exercise of religion.

45.    James Madison, the principal architect of the Free Exercise Clause, defined "religion" as "'the duty which we owe to our Creator and the manner of discharging it.'" James Madison, *Memorial and Remonstrance* (June 20, 1785) (quoting Article XVI, Virginia Declaration of Rights (1776)). The Supreme Court of the United States has held that Madison's argument was that "religion," under that definition, "was not within the cognizance of civil government." *Reynolds v. United States*, 98 U.S. 145, 163 (1879).

46.    James Madison said in his *Memorial and Remonstrance*:

Because we hold it for a fundamental and undeniable truth, "that Religion or the duty which we owe to our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence." The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him. This duty is precedent,

both in order of time and in degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governour of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the General Authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man[']s right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance.

James Madison, *Memorial and Remonstrance* (June 20, 1785).

47.     The United States Supreme Court attached Madison's *Memorial and Remonstrance* to its opinion in *Everson v. Bd. of Educ. of the Twp. of Ewing*, 330 U.S. 1 (1947).

48.     Madison viewed religious liberty as a *jurisdictional* matter. Neither civil society nor the government could make a person revoke his duty to "the Universal Sovereign," which is why, in Madison's view, "in matters of Religion, no man[']s right is abridged by the institution of Civil Society" and "Religion is wholly exempt from its cognizance."

49.     In *Reynolds*, the Supreme Court analyzed Thomas Jefferson's bill for establishing religious freedom as follows:

[A]fter a recital "that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty," it is declared "that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into

overt acts against peace and good order." *In these two sentences is found the true distinction between what properly belongs to the church and what to the State.*

*Reynolds*, 98 U.S. at 163 (emphasis added).

50. Thomas Jefferson wrote to the Danbury Baptist Association that the First Amendment builds "a wall of separation between church and State." *Reynolds*, 98 U.S. at 164. Although the courts have deviated from Jefferson's original understanding of this phrase, Jefferson recognized that there was a *jurisdictional* separation between the institution of the church and the institution of the State. This concept, although mangled by later Supreme Court decisions, is still in our First Amendment jurisprudence.

51. Because "religion" is "the duty which we owe to our Creator and the manner of discharging it," and because Plaintiffs believe that they have a duty to assemble the church in person as opposed to another means, the Defendants violated Plaintiffs' religious liberty by forbidding them from doing so.

52. Plaintiffs' principles have not caused a "break out into overt acts against peace and good order." *Reynolds*, 98 U.S. at 163. Consequently, the decision of whether to assemble his church or not belongs to the church, not to the state.

53. Supreme Court jurisprudence, although deviating from the Constitution's original intent, has continued to recognize that there are matters that belong

exclusively to the church and not to the state, even if a valid neutral law of general applicability stands to the contrary. *See, e.g.*, *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S.Ct. 1719, 1727 (2018) (stating that the Free Exercise Clause would protect a member of the clergy with religious objections to same-sex marriage from having to officiate a same-sex wedding); *Obergefell v. Hodges*, 135 S.Ct. 2584, 2607 (2015) (stating that the First Amendment protects religious people and organizations who advocate the teaching that same-sex marriage is sinful); *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012) (recognizing that the First Amendment exempts churches from generally applicable employment laws as to the hiring and firing of ministers).

54.  *Employment Division v. Smith*, 494 U.S. 872 (1990) held that "the right to free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U.S. at 879 (citations omitted). But that same case also held:

But the "exercise of religion" often involves not only belief and profession but the performance (or abstention from) physical acts: *assembling with others for a worship service*, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation. It would be true, we think (though no case of ours has involved the point), that a State

would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.

*Id.* at 877 (emphasis added; alteration in original).

55. If Congress can make no "law" prohibiting the free exercise of religion, then surely a Chief Executive (not delegated law-making authority by a law-making body) can make no rule restricting the free exercise of religion, either.

56. If the "wall of separation between church and State" prevents the State from deciding who churches can choose as their ministers, what they can teach, and which ceremonies they can perform, then surely that wall separates the State from the church on an even more fundamental matter—whether the church may meet at all.

57. Furthermore, in this case, there is not even a "valid and neutral law of general applicability." Indeed, there is no "law" involved, but only the order of Governor Edwards. This "rule" is not only not "law," but it is also not generally applicable, because it arbitrarily distinguishes between "essential" and "nonessential" businesses. This arbitrary distinction is in itself discriminatory, as the Governor is deciding, contrary to the belief of many Christians, that religious services or gatherings are "non-essential."   In contrast to Governor Edwards' orders, fifteen other states have recognized

their jurisdictional limits and either declared religious services "essential" or otherwise declined to regulate them in any manner.[6]

58.    Furthermore, as if to cement this truth, the Louisiana legislature passed an Act specifically prohibiting an emergency executive order from interfering with the constitutional rights of free exercise of religion, free speech, and freedom of assembly. *See* Count VIII, *infra*.

59.    Defendants Roger Corcoran and Sheriff Sid Gautreaux have required Pastor Spell to cease from holding church services by threat of or by actual arrest and citation, supposedly for the sake of protecting the public, while allowing similarly situated secular businesses to remain open and to be less strictly regulated. At the time of Pastor Spell's original arrest and citation for violating the Governor's Emergency Orders, local Wal-Mart stores were utilizing no restrictions whatsoever on persons being admitted to their stores, or requiring any "social distancing." Presently Wall-Mart stores and other "essential" retailers allow more than ten persons to be in the premises; indeed, hundreds if not thousands visit local "big box" retailers in the Baton Rouge area daily.[7]   While some of the stores take minimal "social distancing" precautions, others take none, and are not apparently threatened

---

[6] Pew Research Center, "Most States have religious exemptions to COVID-19 social distancing rules," April 27, 2020, Virginia Villa, http://www.pewresearch.org/fact-tank/2020/04/27/most-states-have-religious-exemptions-to-covid-19-social-distancing-rules/
[7] See Affidavit of Marlan Shaye Spell, attached as Exhibit "E."

or punished by law enforcement[8] If Pastor Spell told his congregation to meet at Home Depot, Lowe's, or Walmart, then he apparently would not have been violating the Governor's orders, but since he told them to meet at Life Tabernacle Church, he is facing fines and possible imprisonment.

60. The unequal treatment between Plaintiffs and secular businesses shows that, even if the "least restrictive means" analysis is applicable, prohibiting gatherings of ten people or more is not the least restrictive means for the government to achieve its interest. If the Defendants contend otherwise, then they will have to explain why Home Depot and Walmart may have more than ten people in one place but Pastor Spell's church cannot.

61. Furthermore, the Defendant Judge Crifasi also placed unconstitutional conditions on Pastor Spell's bail, ordering him "not to violate Governor Edwards' emergency orders," despite no factual determination having been made that Pastor Spell has actually violated said orders[9] and despite that issue not being before the Court on the charge at hand. Judge Crifasi further issued the blatantly unconstitutional order "not to preach at his church" in order to avoid confinement and being subject to contempt of court. Pastor Spell is currently wearing an ankle bracelet and is confined by Judge

---

[8] See, affidavit of Marlan Shaye Spell, attached as Exhibit "E."
[9] See, Affidavit of Pastor Spell, attached as Exhibit "B", regarding voluntary "social distancing" measures being undertaken at Life Tabernacle Church, the Governor's Emergency Orders and the as yet unlitigated criminal citations for violations of the Governor's Orders issued to Pastor Spell.

Crifasi's order to his home.  Judge Crifasi has expressed his intent to enforce this confinement and bail restriction by use of the contempt power.[10] Judge Crifasi's actions in refusing to even let Pastor Spell preach (not just assemble at a church, but preach), Defendant Judge Crifasi yet again infringed on another matter that belongs exclusively to the church, which is the preaching of God's Word.

62.    The Defendants' words and actions, individually and cumulatively, impose, at a minimum, a substantial burden on the free exercise of Plaintiffs' sincerely-held religious convictions.

63.    The Defendants have therefore violated Plaintiffs' right to free exercise of religion.

64.    Defendants' actions have caused and will continue to cause irreparable harm, because they violate Plaintiffs' constitutionally protected rights as herein stated, and because they critically disrupt the operations of Life Tabernacle. Regular church attendance is perpetuated by habit, and habits once broken are difficult to reestablish.  Once the Governor's Emergency Orders are finally lifted it is questionable whether the worship and ministry of Life Tabernacle will ever be restored to *status quo ante*.  This principle is

---

[10] See, Order of April 27th, 2020, in the case of State of Louisiana v. Mark Anthony Spell, case number J-2000197359, Section I, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, signed by Judge Crifasi, a copy of which is attached as Exhibit "D".

illustrated by the Holy Scripture recognized as authoritative by Pastor Spell and Life Tabernacle, "Smite the shepherd, and the sheep shall be scattered." Zechariah 13:7.

### Count II:  Establishment Clause, Federal Constitution

65.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

66.  The First Amendment provides in part, "Congress shall make no law respecting an establishment of religion. . . "

67.  In the case of *Lee v. Weisman*, 505 U.S. 577 (1992), the U.S. Supreme Court held that a Jewish prayer spoken by a rabbi at a middle-school graduation violated the Establishment Clause.  The Court noted that the principal had chosen the rabbi to lead in prayer and stated further at p. 588,

> The State's role did not end with the decision to include a prayer and with the choice of clergyman.  Principal Lee provided Rabbi Gutterman with a copy of the "Guidelines for Civi Occasions" and advised him that his prayers should be nonsectarian.  Through these means, the principal directed and controlled the content of the prayer.  Even if the only sanction for ignoring the instructions were that the rabbi would not be invited back, we think no religious representative who valued his or her continued reputation and effectiveness in the community would incur the State's displeasure in this regard.  "It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as part of a religious program carried on by government,"
> *Engle v. Vitale*, 370 U.S. 421, 425 (1962)' and that is what the school officials attempted to do.

68.  In the case at bar, the Governor's Executive Order effectively prohibits Pastor Spell and Life Tabernacle from conducting worship services that include baptism and the laying on of hands, practices that Pastor Spell and Life Tabernacle believe constitute an essential part of their worship service. Just as Principal Lee told Rabbi Gutterman what his prayer could and could not include, so the Governor's Order has effectively told Pastor Spell what their worship service can and cannot include.  Similarly, Judge Crifasi went far beyond the Governor's Order and told Pastor Spell he could not preach or conduct worship services at all.  This is precisely the kind of entanglement of church and state that the Establishment Clause was intended to preclude.

Recent Supreme Court cases addressing the Establishment Clause have required the Courts to examine whether a practice was accepted by the Founding generation. *See, e.g., Town of Greece v. Galloway*, 134 S.Ct. 1811, 1819 (2014) ("Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change."); *American Legion v. American Humanist Association*, 139 S.Ct. 2067, 2087 (2019) ("in later cases, we have taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance."). One of the primary objectives of the Establishment Clause was to forbid the government from telling churches

20

how to worship, how to preach, how to assemble, or how to do other essential church functions. But that is exactly what the Defendants have done here. The Defendants have therefore violated the Establishment Clause of the First Amendment to the United States Constitution.

### Count III:  Freedom of Assembly, Federal Constitution

69.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

70.   The First Amendment's Freedom of Assembly Clause, incorporated and made applicable to state and local governmental action by the Fourteenth Amendment to the United States Constitution, states that the government may not abridge "the right of the people to peaceably assemble, and to petition the government for a redress of grievances."

71.   The grammar of this Clause indicates that the right to peaceably assemble and the right to petition the government for a redress of grievances are two different rights. They are often seen together, especially in cases of peaceful protests of government policies. Nevertheless, the Constitution does not recognize the right of the people "to peaceably assemble and petition the government for a redress of grievances." Instead, it recognizes "the right of the people to peaceably assemble, *and* to petition the government for a redress of grievances." (Emphasis added.) They are two separate rights.

72.　The Defendants' actions have forbidden Pastor Spell and Life Tabernacle Church from assembling together for a worship service.

73.　Therefore, the Defendants have violated Plaintiffs' freedom of assembly.

### Count III: Freedom of Speech—Federal Constitution

74.　Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

75.　The First Amendment's Free Speech Clause, incorporated and made applicable to state and local governmental action by the Fourteenth Amendment to the United States Constitution, prohibits burdening the freedom of speech.

76.　The Defendants' actions restrict Pastor Spell from speaking to his congregation and the members of his congregation from speaking to him and to each other.

77.　At the very least, the Defendants' actions are not permissible time, place, or manner restrictions on Plaintiffs. They are not narrowly tailored to achieve a substantial government interest, nor do they leave open ample alternative forms of communication.

78.　Moreover, when the Defendant Judge Crifasi released Pastor Spell on bail, he ordered Pastor Spell to refrain from preaching to his congregation at all, upon pain of contempt of court, which is punishable by fines and

imprisonment. This restriction on Pastor Spell's speech was content-based and is not the least restrictive means of achieving a compelling government interest.

79.   The Defendants have therefore violated Plaintiffs' freedom of speech.

**Count IV: Equal Protection—Federal Constitution**

80.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

81.   The Fourteenth Amendment prohibits the states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

82.   The Defendants' actions are unconstitutional abridgements of Plaintiffs' right to equal protection under the law, are not neutral, and specifically target Plaintiffs and other religious groups for unequal treatment.

83.   The Defendants' actions abridge Plaintiffs' right to equal protection because they treat Plaintiffs differently from other similarly situated businesses and non-religious entities on the basis of the content and viewpoint of the gatherings that Pastor Spell and Life Tabernacle Church hold.

84.   The Defendants have therefore violated Plaintiffs' right to equal protection under the law.

**STATE CLAIMS**

**Count V: Free Exercise of Religion—Louisiana Constitution**

85.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

86.   Article I, § 8, of the Louisiana Constitution says, "No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof."

87.   Because the language of the Louisiana Constitution mirrors that of the Federal Constitution, it requires at least as much protection for free exercise of religion as the Federal Constitution does.

88.   Plaintiffs hereby incorporate all paragraphs in Count I above and allege that the Defendants violated their right to free exercise of religion under the State Constitution for the same reasons.

89.   Moreover, Article I, Section 1 of the Louisiana Constitution states, "The rights enumerated in this Article are inalienable by the state and shall be preserved inviolate by the state." The right to free exercise of religion is one of the rights in the Louisiana Declaration of Rights that the state constitution says must remain "inviolate." Thus, whatever police powers the people of Louisiana gave to their state government, they never gave the state the power to infringe on religious liberty.

90.   The Defendants have therefore violated Plaintiffs' right to free exercise of
      religion under the Louisiana Constitution.

### Count VI: Freedom of Assembly—Louisiana Constitution

91.   Plaintiffs reallege and incorporate by reference all preceding paragraphs of
      this Complaint, as if fully set forth in this Count.

92.    Article I, § 9 of the Louisiana Constitution says, "No law shall impair the
      right of any person to assemble peaceably or to petition government for a
      redress of grievances."

93.    This is similar to the Freedom of Assembly Clause protected by the First
      Amendment to the United States Constitution, but with one important
      difference. The First Amendment says, "the right of the people to assemble,
      and petition the government for a redress of grievances." (Emphasis added.)
      The First Amendment's language is conjunctive, but the Louisiana
      Constitution's language is disjunctive. Thus, even if the First Amendment
      could be construed to be talking about one right instead of two, the
      Louisiana Constitution is talking about two rights, not one. Under the
      Louisiana Constitution, therefore, the right to peaceably assemble therefore
      absolutely is not dependent on petitioning the government for a redress of
      grievances.

94. Like freedom of religion, Article I Section 1 of the Louisiana Constitution requires the government to keep the right to peaceably assemble "inviolate." The State's police powers therefore do not extent to the abridgment of freedom of assembly.

95. The Defendants' actions have forbidden Plaintiffs from assembling for a worship service.

96. Therefore, the Defendants have violated Plaintiffs' freedom of assembly.

## Count VII: Freedom of Speech—Louisiana Constitution

97. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

98. Article I, § 7, of the Louisiana Constitution says, "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom."

99. Because the first sentence of this Clause is nearly identical to the First Amendment's Free Speech Clause, it protects at least as much speech as the Federal Constitution does.

100. Like freedom of religion, Article I Section 1 of the Louisiana Constitution requires the government to keep the right to freedom of speech "inviolate."

The State's police powers therefore do not extend to the abridgment of freedom of speech.

101.  The Defendants' actions restrict Pastor Spell from speaking to his congregation and the members of his congregation from speaking to him and each other.

102.  At the very least, the Defendants' actions are not permissible time, place, or manner restrictions on Plaintiffs. They are not narrowly tailored to achieve a substantial government interest, nor do they leave open ample alternative forms of communication, and in no way are susceptible to interference by state or federal government under the Constitution of Louisiana or the United States Constitution.

103.  Moreover, when the Defendants released Pastor Spell on bail, they refused to let him preach to his congregation at all. This restriction on Pastor Spell's speech was content-based and is not the least restrictive means of achieving a compelling government interest.

104.  The Defendants have violated Plaintiffs' freedom of speech.

## Count VIII: Louisiana Homeland Security and Emergency Assistance and Disaster Act—Louisiana Statutory Law

105.  Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

106.  The State's emergency powers are governed by The Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:721 et seq. ("the Emergency Act")

107.  In spite of all the powers that the Act gives to the state, it makes clear that "Nothing in this Chapter shall be interpreted to diminish the rights guaranteed to all persons under the Declaration of Rights of the Louisiana Constitution or the Bill of Rights of the United States Constitution." La. R.S. 29:736(D).

108.  If the United States Constitution and the Louisiana Constitution did not make it clear enough already, the Emergency Act itself clarifies that the State's emergency powers cannot diminish the rights recognized in the Federal and State Constitutions. This is a clear recognition that the Governor may not make a rule that alters the law.

109.  The Governor's power in emergency matters is further curtailed by the Preservation of Religious Freedom Act, La. Rev. Stat. 13: 5231 *et seq*.

110.  The Louisiana Legislature explicitly rejected in that Act the principles of law enunciated in the U.S. Supreme Court case of *Employment Division v. Smith,*

494 U.S. 872 (1990), in favor of the legal test enunciated in the U.S. Supreme Court case of *Sherbert v. Verner*, 374 U.S. 398 (1963).

111.  By using these emergency powers to abridge Plaintiffs' constitutional rights, the Defendants are violating the Emergency Act and the Preservation of Religious Freedom Act as well.

112.  Under the provisions of the Preservation of Religious Freedom Act, Plaintiffs' are entitled to injunctive relief, actual damages, attorney fees and costs.

113.  The Governor's Emergency Orders are not made less onerous or less violative of Plaintiffs' Constitutionally protected rights by the latest "guidelines" proposed and promulgated in the news media but not yet made official.[11]  Among restrictions on Plaintiffs' constitutionally protected rights are:  a) requirement to meet out of doors, a rule that becomes more difficult in unpredictable South Louisiana weather; b) special rules for any open air "tent" or covering being used; c) rules for new church positions of "crowd control" persons to enforce "social distancing," etc.  Plaintiffs maintain such restrictions are still an impermissible burden upon their constitutionally protected rights, and that the Governor and other defendants are without authority to impose such restrictions upon worship.  Furthermore, all of the

---

[11]  See, "Here are the changes required for religious services in La. during the pandemic," WAFB, Kevin Foster, May 1, 2020, https://www.wafb.com/2020/05/01/here-are-changes-required-religious-services-la-during-pandemic/

other objections to the old orders apply to the new "guidelines," including but not limited to the issue of equal protection, the fact that the church should be considered "essential" along with other essential businesses and enterprises, and that the guidelines restrictions, at best, fail to meet the "least restrictive means" tests.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants, jointly and severally:

a. A temporary restraining order prohibiting the enforcement of the "special conditions of bond" imposed by Judge Crifasi upon Pastor Spell;

b. A temporary restraining order prohibiting Defendants Corcoran, Gautreaux, and the named Defendant executives of Central and East Baton Rouge Parish from the enforcement of Governor John Bell Edwards' "Emergency Orders" against Plaintiffs;

c. A preliminary and, after due proceedings held permanent injunctions prohibiting the actions temporarily restrained, and against the Defendants, enjoining the Defendants from violating Plaintiffs' constitutional rights any further;

d. Awarding the Plaintiffs compensatory, nominal, punitive, and other damages authorized by law;

e. Awarding the Plaintiffs reasonable attorney fees and expert witness fees pursuant to 42 U.S.C. § 1988, and as otherwise provided by law; and

f. Award such other and further relief as the Court deems proper and just.

Respectfully submitted this 6th day of May, 2020.


/s/ Jeffrey S. Wittenbrink
Jeffrey S. Wittenbrink
Lead Counsel
*Attorney for Plaintiffs and*
*Foundation for Moral Law*
400 Convention Street, Ste. 550
Baton Rouge, Louisiana 70802
225-282-0602
jwittenbrink@lawfirmbr.com