UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MARK ANTHONY SPELL, ET AL.
                    Plaintiffs,

VERSUS

JOHN BEL EDWARDS, ET AL.,
                    Defendants.

Case No. 3:20-cv-00282-BAJ-EWD
Judge Brian A. Jackson
Magistrate Judge Erin Wilder-Doomes

## MEMORANDUM IN SUPPORT OF
## DEFENDANT JOHN BEL EDWARDS'S MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED AND SUPPLEMENTAL
## COMPLAINT ON REMAND FROM FIFTH CIRCUIT

JEFF LANDRY
Attorney General

JACK M. WEISS (# 13340)
*Lead Counsel*
Attorney at Law
5938 Laurel Street
New Orleans, LA 70115
Telephone/Facsimile: (504) 267-0637
Email:        jack1656@gmail.com
Special Assistant Attorney General

MATTHEW F. BLOCK (# 25577)
Executive Counsel
Office of the Governor
Louisiana State Capitol
4th Floor
Baton Rouge, Louisiana 70804
Telephone:     (225) 342-7015
Email:        matthew.block@la.gov

JAMES M. GARNER (# 19589), T.A.
DARNELL BLUDWORTH (# 18801)
JOSHUA S. FORCE (# 21975)
CHRISTOPHER T. CHOCHELES (# 26848)
SHER GARNER CAHILL RICHTER
  KLEIN & HILBERT, L.L.C.
909 Poydras Street, 28th Floor
New Orleans, Louisiana  70112-1033
Telephone:     (504) 299-2100
Facsimile:     (504) 299-2300
Email:        jgarner@shergarner.com
              dlbudworth@shergarner.com
              jforce@shergarner.com
              cchocheles@shergarner.com
Special Assistant Attorneys General

Attorneys For Defendant
GOVERNOR JOHN BEL EDWARDS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

I.    BACKGROUND ............................................................................................1

    A.    The COVID-19 Pandemic................................................................1

    B.    COVID-19 in Louisiana and the State's Response................................2

    C.    Spell's Original Complaint and First Appeal.......................................5

    D.    Spell's Amended Complaint and Second Appeal..................................5

II.   ARGUMENT..................................................................................................6

    A.    Plaintiffs' Claim for Permanent Injunctive Relief Is Moot ..................6

    B.    Plaintiffs' Claim for Injunctive Relief Does Not Fall Within the
        Exception to the Mootness Doctrine..................................................8

    C.    The Governor Is Immune from Plaintiffs' Claims for Damages
        in His Individual Capacity ...............................................................9

    D.    The Challenged Proclamations Did Not Violate Spell's Free
        Exercise-of-Religion Rights.............................................................13

        (1)    The Challenged Proclamations were neutral, generally
                applicable, and rationally related to a legitimate public purpose..............14

        (2)    Alternatively, the Challenged Proclamations were narrowly
                tailored to serve a compelling state interest................................18

        (3)    Plaintiffs' free-exercise rights are not absolute ........................20

    E.    The Challenged Proclamations Did Not Violate Spell's
        Establishment-Clause Rights ...........................................................21

    F.    The Challenged Proclamations Did Not Violate Spell's Speech,
        Assembly, or Equal-Protection Rights...............................................21

    G.    The Eleventh Amendment Bars Spell's State-Law and Injunction
        Claims..........................................................................................23

## **TABLE OF CONTENTS—continued**

(1)    The Court lacks jurisdiction over Plaintiffs' claims for
relief based upon state law under the Eleventh Amendment ..................... 23

(2)    The Eleventh Amendment bars injunctive relief against the
Governor because he is not responsible for enforcing the
Proclamations ............................................................................................ 24

III.    CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**CASE**                                                                                    **PAGE(S)**

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011)...................................................................................9, 10

*Baccuss v. Parrish,*
    45 F.3d 958 (5th Cir. 2014) ...................................................................6

*Big Tyme, L.L.C. v. Edwards,*
    985 F.3d 456 (5th Cir. 2021) ...........................................................1, 6, 24

*Board of Trs. of Univ. of Ala. v. Garrett,*
    531 U.S. 356 (2001)...............................................................................24

*Bowen v. Roy,*
    476 U.S. 693 (1986)...............................................................................20

*Calvary Chapel Dayton Valley v. Sisolak,*
    140 S. Ct. 2603 (2020)................................................12-13, 17, 19-20

*Case v. Ivey,*
    No. 2:20-CV-777-WKW, 2021 WL 2210589
    (N.D. Ala. June 1, 2021), *appeal docketed,*
    No. 21-12276 (11th Cir. July 2, 2021)..............................................13, 19, 25

*Church of the Lukumi Babulu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993)...........................................................................14, 15

*City of Austin v. Paxton,*
    943 F.3d 993 (5th Cir. 2019) ..............................................................24-25

*City of Escondido, Calif. v. Emmons,*
    139 S. Ct. 500 (2019) (per curiam) ........................................................9

*Coleman v. Dretke,*
    409 F.3d 665 (5th Cir. 2005) ................................................................2

*Cox v. Louisiana,*
    379 U.S. 536 (1936)...............................................................................22

*Cunningham v. Castloo,*
    983 F.3d 185 (5th Cir. 2020) ...........................................................9, 10

## TABLE OF AUTHORITIES—continued

**CASE**                                                                                           **PAGE(S)**

*Elim Romanian Pentecostal Church v. Pritzker*,
    No. 20 C 2782, 2021 WL 3142111 (N.D. Ill. July 26, 2021) ...........................................25

*Employment Div., Dep't of Human Res. of Or. v. Smith*,
    494 U.S. 872 (1990)...........................................................................................................14

*Empower Texans, Inc. v. Geren*,
    977 F.3d 367 (5th Cir. 2020) .............................................................................................8

*Ex parte Young*,
    209 U.S. 123 (1908)...........................................................................................................25

*Harding v. Ardoin*,
    No. 20-30632, slip op. (5th Cir. May 17, 2021) (per curiam) ...........................................8

*Harvest Rock Church v. Newsom, Gov. of Calif.*,
    141 S. Ct. (2020)...............................................................................................................7

*Honig v. Doe*,
    484 U.S. 305 (1988)...........................................................................................................9

*In re Abbott*,
    954 F.3d 772 (5th Cir. 2020), *vacated as moot by*
    *Planned Parenthood v. Abbott*, 141 S. Ct. 1261 (2021) ........................................... 10-11

*International Women's Day March Planning Comm. v. City of San Antonio*,
    619 F.3d 346 (5th Cir. 2010) ...........................................................................................23

*Jackson v. City of Hearne, Tex.*,
    959 F.3d 194 (5th Cir. 2020) .............................................................................................9

*Jacobson v. Commonwealth of Massachusetts*,
    197 U.S. 11 (1905)........................................................................................................11, 12

*Kingdomware Techs., Inc. v. United States*,
    136 S. Ct. 1969 (2016)......................................................................................................8

*Lighthouse Fellowship Church v. Northam*,
    458 F. Supp. 3d 418 (E.D. Va. 2020) ..............................................................................22

### TABLE OF AUTHORITIES—continued

**CASE**                                                                                          **PAGE(S)**

*Littlefield v. Forney Indep. Sch. Dist.*,
   268 F.3d 275 (5th Cir. 2001) ..................................................................14, 21

*McKinley, D.C. v. Abbott*,
   643 F.3d 403 (5th Cir. 2011) ..........................................................................24

*Moore v. Brown*,
   868 F.3d 398 (5th Cir. 2017) ..........................................................................22

*Morris v. Livingston*,
   739 F.3d 740 (5th Cir. 2014) ..........................................................................25

*Motient Corp. v. Dondero*,
   529 F.3d 532 (5th Cir. 2008) ............................................................................6

*Mullenix v. Luna*,
   577 U.S. 7 (2015) ............................................................................................10

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) ..........................................................................24

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984).........................................................................................24

*Peyote Way Church of God, Inc. v. Smith*,
   742 F.2d 193 (5th Cir. 1984) ..........................................................................20

*Prince v. Massachusetts*,
   321 U.S. 158 (1944).........................................................................................11

*Raygor v. Regents of Univ. of Minn.*,
   543 U.S. 533 (2002) ........................................................................................23

*Reynolds v. United States*,
   98 U.S. 145 (1878)..........................................................................................20

*Rodrigue v. Copeland*,
   475 So.2d 1071 (La. 1985) ..............................................................................24

*Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*,
   141 S. Ct. 63 (2020) (per curiam) .......................................7, 12, 13, 17-18, 19

## TABLE OF AUTHORITIES—continued

**CASE**                                                                                    **PAGE(S)**

*Seegers v. Parker*,
    241 So.2d 213 (La. 1970) ..................................................................................24

*Sherbert v. Verner*,
    374 U.S. 398 (1963).........................................................................................20

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ("*South Bay I*")....................................12, 13, 16, 17, 18

*South Bay United Pentecostal Church v. Newsom*,
    141 S. Ct. 716 (2021) ("*South Bay II*") ..................................................16, 18

*Spell v. Edwards*,
    962 F.3d 175 (5th Cir. 2020) ("*Spell I*")........................................ 5, 6-7, 8, 15

*Spell v. Edwards*,
    No. 20A91 (U.S. Nov. 27, 2020),
www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20a91.html ........7

*Spell v. Edwards*,
    849 F. App'x 509 (5th Cir. 2021) (per curiam) ("*Spell II*") ..........................6, 16

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) (per curiam)................................................7, 15, 16, 17

*Vogt v. Board of Comm'rs of Orleans Levee Dist.*,
    294 F.3d 684 (5th Cir. 2002) ...........................................................................23

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)....................................................................................22, 23

## CODES AND STATUTES

LA. REV. STAT. § 13:5106(a) ............................................................................. 23-24

LA. REV. STAT. § 29:736(D) ...................................................................................24

28 U.S.C. § 1367.......................................................................................................23

<u>**TABLE OF AUTHORITIES—continued**</u>

<u>**PAGE(S)**</u>

<u>**OTHER AUTHORITIES**</u>

*Attorney General William Barr Issues Statement on Religious Practice and*
    *Social Distancing* (Apr. 14, 2020), https://bit.ly2RIYzHO ...............................17

Centers for Disease Control, COVID-19, *How COVID-19 Spreads*,
    https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-
    spreads.html (last visited Aug. 19, 2021) ..........................................................1

Kate Conger, et al., *Churches Were Eager to Reopen.*
    *Now They Are Confronting Coronavirus Cases*, N.Y. TIMES, July 8, 2020,
    available at https://nyti.ms/3iG8GJw.................................................................2

Interpretive Mem. 2020-24, Office of State Fire Marshall
    (May 1, 2020), http://sfm.dps.louisiana.gov/doc/interpmemos/im_2020-24.pdf ...............3

La. Dep't of Health, COVID-19,
    ldh.la.gov/coronavirus (last visited Aug. 19, 2021) ..........................................1

Office of the Governor, Newsroom, Proclamations,
    https://gov.louisiana.gov/index.cfm/newsroom/category/23....................................2

MAY IT PLEASE THE COURT:

Defendant John Bel Edwards, Governor of the State of Louisiana, (the "Governor") files this Memorandum in Support of his Motion to Dismiss the First Amended and Supplemental Complaint ("Amended Complaint") filed by Plaintiffs Mark Anthony Spell and the Life Tabernacle Church (collectively "Plaintiffs" or "Spell"). The Court should dismiss the First Amended Complaint because (1) the Court lacks jurisdiction over Plaintiffs' claims for injunctive relief and relief under state law; (2) the Governor enjoys qualified immunity from Plaintiffs' claims for money damages; and, (3) alternatively, the Governor did not violate Plaintiffs' constitutional rights, under federal or state law, as a matter of law.

## I.    BACKGROUND

### A.    The COVID-19 Pandemic.

COVID-19 has caused an "unprecedented public health emergency." *Big Tyme, L.L.C. v. Edwards*, 985 F.3d 456, 460 (5th Cir. 2021). Louisiana is now experiencing its fourth deadly surge of the disease. The number of confirmed cases in Louisiana stands at 643,993, and 11,851 Louisianians have died from the disease. *See* La. Dep't of Health, COVID-19, available at ldh.la.gov/coronavirus (last visited Aug. 19, 2021).

The novel coronavirus, especially the Delta variant, is highly contagious and spreads quickly. "COVID-19 spreads when an infected person breathes out droplets and very small particles that contain the virus[, which are] . . . breathed in by other people or land on their eyes, noses, or mouth. In some circumstances, they may contaminate surfaces they touch. People who are closer than 6 feet from the infected person are most likely to get infected." Centers for Disease Control, COVID-19, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Aug. 19, 2021).

Gatherings, especially indoors, present a heightened risk for spreading the virus because a positive person can infect large numbers of people.  Churches, in particular, have been identified as major sources of the spread of COVID-19, at times causing super-spreader events.  *See* Kate Conger, et al., *Churches Were Eager to Reopen.  Now They Are Confronting Coronavirus Cases*, N.Y. Times, July 8, 2020, available at https://nyti.ms/3iG8GJw.

### B.    COVID-19 in Louisiana and the State's Response.

On March 11, 2020, the Governor declared a statewide public health emergency in response to the disease.  *See* La. Exec. Dep't, Proclamation No. 25 JBE 2020 (Mar. 11, 2020).[1] On March 13, the Governor limited all "gatherings in a single space at the same time where individuals will be in close proximity to one another" to no more than 250 people and closed all public schools.  *Id.*, Proclamation No. 27 JBE 2020 § 1 (Mar. 13, 2020).  On March 16, due to rising COVID numbers, Governor Edwards reduced the permissible gathering size to no more than fifty people.  *Id.*, Proclamation No. 30 JBE 2020 § 1 (Mar. 16, 2020).  This Proclamation also closed all casinos, video poker establishments, movie theaters, bars, and fitness centers and gyms and prohibited the on-site consumption of food and beverages at restaurants.  *Id.* §§ 2-3.

Cases in Louisiana continued to rise.  Thus, on March 22, the Governor issued a statewide "general stay-at-home" order, directing all individuals to "stay home unless performing an essential activity."  *Id.*, Proclamation No. 33 JBE 2020 § 3 (Mar. 22, 2020).  "[G]oing to and from an individual's place of worship" was identified as an essential activity.  *Id.* § 1(E).  The Proclamation also prohibited gatherings of groups of more than ten people and closed certain non-essential businesses, including public amusement, personal care, and grooming businesses and

---

[1] The Proclamations are available at https://gov.louisiana.gov/index.cfm/newsroom/category/23.  The Court may take judicial notice of the Governor's Proclamations.  *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of state agency's website).

certain malls. *Id.* §§ 2, 4. The stay-at-home order was extended to May 15. *See id.*, Proclamation Nos. 41 JBE 2020 (Apr. 2, 2020), 52 JBE 2020 (Apr. 30, 2020) (30 JBE 2020, 33 JBE 2020, 41 JBE 2020, and 52 JBE 2020 are referred to collectively as the "Stay-at-Home Orders").

On May 14, the Governor moved Louisiana into Phase 1 of "reopening" due to declining COVID-19 cases. *See id.*, Proclamation No. 58 JBE 2020 (May 14, 2020) (the "Phase 1 Order"). The Phase 1 Order followed the White House Coronavirus Task Force's gating criteria for the phased reopening of businesses. Churches, other faith-based organizations, and other businesses were allowed to continue operations at 25% of their total occupancy. *Id.* § 2(G). Churches and other faith-based organizations were also permitted to continue to hold outdoor services, in accordance with the State Fire Marshal's May 1, 2020 guidance, without an express size limitation. *Id.* § 2(G)(4)(b); *see also* Interpretive Mem. 2020-24, Office of State Fire Marshall (May 1, 2020), http://sfm.dps.louisiana.gov/doc/interpmemos/im_2020-24.pdf.

In light of further improvement, the Governor moved the State into Phase 2 on June 4, 2020. *See* La. Exec. Dep't, Proclamation No. 74 JBE 2020 (June 4, 2020) (the "Phase 2 Order"). The Phase 2 Order permitted faith-based organizations and certain other businesses to operate at 50% of their total occupancy. *See id.* § 2(G)(4). The Governor renewed the Phase 2 Order to September 11, 2020. *See id.*, Proclamation Nos. 83 JBE 2020 (June 25, 2020), 96 JBE 2020 (July 23, 2020), 101 JBE 2020 (Aug. 6, 2020), 110 JBE 2020 (Aug. 26, 2020).

Due to another surge of the virus in July 2020, Governor Edwards issued additional Phase 2 mitigation measures to address the "increased risk of infection at large gatherings . . ., necessitating a reduction in the number of people who can gather in a single space at a single time, where strict social distancing is unable to occur." *Id.*, Proclamation No. 89 JBE 2020 (July 11, 2020). This Proclamation prohibited on-premises consumption of food or drink at bars and

3

lowered the maximum crowd size for indoor and outdoor gatherings to fifty people but excepted churches and other faith-based organizations. *Id.* §§ 2-3.

On September 11, the Governor moved the State into Phase 3 of reopening. *See id.*, Proclamation No. 117 JBE 2020 (Sept. 11, 2020) (the "Phase 3 Order"). The Phase 3 Order permitted churches, faith-based organizations, and other businesses to operate at 75% of their total capacity. *Id.* § 2(D)(4). Bars were allowed to open at 25% capacity under certain conditions, sports venues were permitted, for the first time, to host events at 25% capacity, and event centers and reception halls could operate at the lesser of 50% of total occupancy or 250 people. *Id.* § 2(D)(7), (8). Places of public amusement, including concert and music halls, remained closed. Churches and faith-based organizations continued to be exempted from the size restrictions on indoor and outdoor gatherings applicable to other businesses. *See id.* § 2(D)(4)(e). The Governor extended the Phase 3 Order to December 4. *See id.*, Proclamation Nos. 123 JBE 2020 (Sept. 17, 2020), 134 JBE 2020 (Oct. 8, 2020), 143 JBE 2020 (Oct. 22, 2020), 158 JBE 2020 (Nov. 5, 2020).

Beginning in early November, Louisiana experienced a third surge of COVID-19. *See id.*, Proclamation No. 168 JBE 2020 (Nov. 24, 2020) (the "Modified Phase 2 Order"). As a result, the Governor returned Louisiana to a modified Phase 2, reducing the crowd-size limit on most businesses, including restaurants, shopping malls, and gyms, from 75% to 50% of total capacity. *See id.* § 2(D). The Modified Phase 2 Order did not reduce the indoor or outdoor capacity limits for churches or other faith-based organizations. *See id.*, § 2(D)(4).

Louisiana remained under these restrictions, *see id.*, Proclamation Nos. 209 JBE 2020 (Dec. 22, 2020), 6 JBE 2021 (Jan. 12, 2021), until the Governor returned the State to Phase 3 on March 2, 2021. *See id.*, Proclamation No. 29 JBE 2021 (Mar. 2, 2021). The reentry to Phase 3 removed all capacity limitations on religious services held by churches and other faith-based

organizations.  *See id.*, § 2(D).  Since then, the Governor's proclamations have imposed no crowd-size limitations on religious services.  *See id.*, Proclamation Nos. 66 JBE 2021 (Mar. 30, 2021), 79 JBE 2021 (Apr. 27, 2021), 85 JBE 2021 (May 14, 2021), 93 JBE 2021 (May 25, 2021), 117 JBE 2021 (June 22, 2021), 131 JBE 2021 (July 21, 2021).

**C.     Spell's Original Complaint and First Appeal.**

On May 7, 2020, Spell filed his Original Verified Complaint against the Governor and others challenging the Stay-at Home Orders and sought a temporary restraining order and preliminary injunction to enjoin the Governor's "Emergency Orders."  The Court heard Spell's injunction motion on May 14 and denied it on May 15.  *See* Rec. Doc. 46.

Spell appealed that ruling on June 5, and, on June 8, Spell filed an Emergency Motion for Injunction Pending Appeal and to Expedite Appeal (the "Emergency Motion").  On June 18, 2020, the United States Court of Appeals for the Fifth Circuit denied the Emergency Motion as moot because the Stay-at-Home Orders had expired more than a month earlier.  *See Spell v. Edwards*, 962 F.3d 175, 179-80 (5th Cir. 2020) ("*Spell I*").  The Court dismissed Spell's appeal for the same reason, noting that his "claim for damages remains in the district court."  *Id.*

On July 2, 2020, Spell filed a Petition for Rehearing En Banc, which was denied.  On November 18, 2020—nearly four months later—Spell sought an emergency injunction pending appellate and certiorari review from the Supreme Court of the United States (Docket No. 20A91).  On November 27, 2020, Justice Alito summarily denied Spell's application without calling for a response or referring it to the full Court.  Spell did not file a petition for writ of certiorari.

**D.     Spell's Amended Complaint and Second Appeal.**

On May 29, 2020, Spell filed his Amended Complaint, asserting the same federal- and state-law "counts" and seeking the same injunctive relief and damages as in the original complaint.

*See* Rec. Doc. 58.  This complaint mentioned 27 JBE 2020, 30 JBE 2020, the Stay-at-Home Orders, and the Phase 1 Order (collectively the "Challenged Proclamations") but did not seek injunctive relief or damages with respect to any specific order(s).  On June 16, 2020, the Governor filed a motion to dismiss the Amended Complaint.  Rec. Doc. 74.  Spell did not timely oppose the motion to dismiss.  This Court subsequently (a) denied Spell's request to file an untimely opposition, (b) considered the merits of the motion to dismiss and granted that motion, and (c) entered judgment dismissing Spell's claims with prejudice.  Rec. Docs. 95-96.

On November 13, 2020, Spell filed a second appeal.  On June 11, 2021, the Fifth Circuit vacated this Court's judgment dismissing Spell's claims and remanded the case for this Court to "analyze the plaintiffs' claims for damages in light of [recent] Supreme Court authority."  *Spell v. Edwards*, 849 F. App'x 509, 510 (5th Cir. 2021) (per curiam) ("*Spell II*"). The Fifth Circuit was careful to note that it "express[ed] no opinion on the merits of the immunity defenses raised by the defendants, which the district court should review in the first instance."  *Id.*

## II.    ARGUMENT

### A.    Plaintiffs' Claim for Permanent Injunctive Relief Is Moot.

"Whether an appeal is moot is a jurisdictional matter, since it implicates the Article III requirement that there be a live case or controversy."  *Big Tyme*, 985 F.3d at 464 (quotation and citation omitted).  An actual case or controversy must exist at every stage of a lawsuit, not just at the outset.  *Motient Corp. v. Dondero*, 529 F.3d 532, 537 (5th Cir. 2008).  Thus, "[e]vents both before and after the filing of a claim may render a claimant's case moot."  *Baccuss v. Parrish,* 45 F.3d 958, 961 (5th Cir. 2014).

"A matter is moot when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Spell I*, 962 F.3d at 179 (quotation and citation omitted).  Therefore, "a

case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed. Once the law is off the books, there is nothing injuring the plaintiff and, consequently, nothing for the court to do." *Id.* (citation omitted). A defendant may not render a case moot simply by ending the allegedly unlawful conduct in the midst of litigation. *Id.* "But a statute that expires by its own terms does not implicate those concerns. Why? Because its lapse was predetermined and thus not a response to litigation." *Id.*

The last Emergency Proclamation Spell seeks to enjoin is the Phase 1 Order, which permitted churches and other faith organizations to operate at 25% of their total occupancy. *See supra* at 3. The Phase 1 Order expired on June 5, 2020. Currently, Louisiana imposes no crowd-size limitations on churches and other faith-based organizations. *See supra* at 4-5. Therefore, Spell's claim to enjoin the Governor's orders limiting the number of people who may assemble for prayer services is moot and should be dismissed.

Moreover, Plaintiffs do not "remain under a constant threat" that the Phase 1 or other restrictions will be reimposed as in *Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam), nor does the Governor have a "track record of 'moving the goalposts'" as in *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam) (citation omitted). The Governor has consistently reduced the limitations on faith-based organizations, as the science and data permitted, since issuing the Stay-at-Home Orders. *See supra* at 3-5. Indeed, the Supreme Court perceived no continuing threat to Spell in summarily denying his request for an emergency injunction while contemporaneously remanding other lower court orders refusing to enjoin COVID-related restrictions on churches for further consideration in light of *Roman Catholic Diocese*. *Compare, e.g.*, *Harvest Rock Church v. Newsom, Gov. of Calif.*, 141 S. Ct. (2020), *with* www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20a91.html.

7

**B.    Plaintiffs' Claim for Injunctive Relief Does Not Fall Within the Exception to the Mootness Doctrine.**

The exception to the mootness doctrine for cases that are "capable of repetition, yet evading review" "overcomes the general rule against deciding stale claims only if:  (1) 'the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration,' and (2) 'there [is] a reasonable expectation that the [plaintiff] [will] be subject to the same action again.'" *Spell I*, 962 F.3d at 180 (quoting *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016)).  The burden rests on Spell to prove these requirements, *id.*; the exception applies "only in exceptional situations."  *Kingdomware*, 136 S. Ct. at 1976.

Spell cannot establish that the Governor is likely to reimpose the 25%-occupancy limit on places of worship.  *See Spell I*, 962 F.3d at 180.  The Governor consistently raised the occupancy limit for churches and other faith-based organization before removing it entirely on March 2, 2021. *See supra* at 3-5.  For Spell and other faith-based organizations, "the trend in Louisiana has been to reopen the state, not to close it down. . . . [I]t is speculative, at best, that the Governor might reimpose the [Phase 1] restriction or a similar one."  *Spell I*, 962 F.3d at 180.

Spell also cannot satisfy the "evading review" requirement.  "Claims need to be judged on how quickly relief can be achieved in relation to the specific claim," and a party's failure to prosecute his claim diligently precludes the "capable-of-repetition" exception.  *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370-71 (5th Cir. 2020).  Spell has not acted diligently at any stage of this litigation, *see, e.g.*, *Spell I*, 972 F.3d at 178, and should not be heard to claim now that he cannot litigate his claims because of the duration of the orders.  Regardless, "there is no indication that [Spell] will be unable to use the tools available to obtain meaningful review" in response to any future restrictions.  *Harding v. Ardoin*, No. 20-30632, slip op. at 2 (5th Cir. May 17, 2021) (per curiam) (dismissing appeal).  Because a court cannot enjoin conduct that has ceased and Spell

challenges no order that remains in effect, no actual controversy exists for this Court to decide, and it should dismiss the injunction claim as moot. *See Honig v. Doe,* 484 U.S. 305, 317 (1988).

### C.    The Governor Is Immune from Plaintiffs' Claims for Damages in His Individual Capacity.

The Governor enjoys qualified immunity from liability for damages in his individual capacity.[2]  Qualified immunity shields a government official from individual liability "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam).  The Fifth Circuit's two-pronged test for qualified immunity asks "whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right" and "whether the right was 'clearly established.'" *Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2020).  A court may analyze these prongs in either order and resolve the case on a single prong, *id.* at 190, but, once raised, the plaintiff bears the burden of overcoming the defense. *Jackson v. City of Hearne, Tex.*, 959 F.3d 194, 201 (5th Cir. 2020).  "When properly applied, [the defense] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Plaintiffs cannot satisfy either prong of this test, let alone both.  The Proclamations have not violated Plaintiffs' constitutional rights, and, therefore, they cannot prove a constitutional violation. *See infra* at 14-23.  Regardless, even if Plaintiffs could prove that their rights had been violated, they still could not possibly show that the 25%-occupancy limit violated any right of

---

[2] Plaintiffs have explicitly conceded that they do not seek to recover damages against the Governor in his official capacity, which the Eleventh Amendment would nevertheless bar. *See* Rec. Doc. 87-3 at 7 ("Plaintiffs . . . have never raised such a claim [for money damages against the Governor in his official capacity] in the first place.  They sued him in his official capacity for prospective relief and in his individual capacity for damages.").

Plaintiffs that was "clearly established" in May 2020. If any principle was "clearly established," at that time, it was that the 25% limit was a reasonable and constitutional response to the pandemic.

"A right is 'clearly established' only if it "is sufficiently clear that every reasonable official would have understood that what he is doing violates the right.'"  *Cunningham*, 983 F.3d at 191 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  The "right must be defined with specificity" and not "at a high level of generality."  *Escondido*, 139 S. Ct. at 503.  This rule imposes a "demanding standard," *Cunningham*, 983 F.3d at 191, and requires "existing precedent [to] have placed the statutory or constitutional question beyond debate."  *Ashcroft*, 563 U.S. at 741.  "The dispositive question is whether the violative nature of the *particular* conduct is clearly established."  *Mullenix*, 577 U.S. at 12.  Spell cannot prove that the allegedly "violative nature" of the Governor's "particular conduct"—issuing emergency orders imposing size limitations on indoor gatherings at churches and other businesses *during an unprecedented worldwide pandemic* spread primarily through close contact and large groups—was "clearly established" at the time.

From March 13, 2020, when the Governor first restricted public gatherings, through the Phase 3 Order, the Governor's orders complied with the existing and governing constitutional precedent.  The Supreme Court did not issue its opinion in *Roman Catholic Diocese* until November 25, 2020.  By then, churches in Louisiana could operate at 75% of their total occupancy, and church attendance had not been subject to numerical limits, which never applied *only* to faith-based organizations, since May 15, 2020.  Before then, the Supreme Court, Fifth Circuit, and other federal courts had all approved orders similar to the Challenged Proclamations.

In *In re Abbott*, 954 F.3d 772 (5th Cir. 2020), filed on April 7, 2020, the Fifth Circuit declared that, when facing a pandemic, such as COVID-19, the "bottom line" is that "a state may implement emergency measures that curtail constitutional rights so long as the measures have at

least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"[3]  *Id.* at 784-85 (quoting *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905)).   The Fifth Circuit expressly observed that "*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency," such as COVID-19.  *Abbott*, 954 F.3d at 786; *see also id.* at 777 ("settled rule [in *Jacobson*] allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home"); 777 n.1 ("The same analysis would apply, for example, to an emergency restriction on gathering in large groups for public worship during an epidemic."); 787 ("Faced with exponential growth of COVID-19 cases, states have . . . prohibited churches from holding public worship services . . . . These measures would be constitutionally intolerable in ordinary times, but are recognized as appropriate and even necessary responses to the present crisis.").

     *Abbott* followed *Jacobson*, in which the Supreme Court upheld a law requiring individuals to be vaccinated against smallpox because constitutional liberties do "not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint.  There are manifold restraints to which every person is necessarily subject for the common good." *Jacobson*, 197 U.S. at 26.  *See also Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) (dictum) (noting that the "right to practice religion freely does not include the liberty to expose the community . . . to communicable disease").

     The Supreme Court reaffirmed *Jacobson*, on May 29, 2020, just days before the Governor issued the Phase 2 Order, in refusing to enjoin California's numerical limitations on churches due

---

     [3] *Abbott* remained controlling law in this Circuit until January 25, 2021 when the Supreme Court vacated it as moot in *Planned Parenthood v. Abbott*, 141 S. Ct. 1261 (2021).

to COVID-19.  *See South Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) ("*South Bay I*").  Chief Justice Roberts wrote that "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *Id.* at 1613-14 (Roberts, C.J, concurring) (citing *Jacobson*, 197 U.S. at 38).  State officials are entitled to "especially broad" latitude in making medical and scientific decisions in times of a pandemic, and where they do not exceed those "broad limits," "they should not be subject to second-guessing by an 'unelected federal judiciary." *Id.* at 1614 (citations omitted).  Not only did the Supreme Court's and Fifth Circuit's precedents support the Governor's actions, but the lower federal courts had almost overwhelmingly upheld similar state COVID-19 mitigation measures. *See* Appendix of Pre-*Roman Catholic Diocese* Cases, which is attached to this Memorandum.

Moreover, even though *Roman Catholic Diocese* enjoined New York's "very severe" restrictions targeting places of worship, the Supreme Court distinguished restrictions it previously had not enjoined in *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020), "limit[ing] in-person worship services to 50 people," and *South Bay I*, "limit[ing] in-person worship to 25% capacity or 100 people, whichever was lower."  *Roman Catholic Diocese*, 141 S. Ct. at 67; *see also id.* at 74 (Kavanaugh, J., concurring).  The Supreme Court identified "other less restrictive rules," such as those adopted by Governor Edwards, observing that "the maximum attendance at a religious service could be tied to the size of the church or synagogue."  *Id.*

Likewise, even justices who dissented in *Calvary Chapel* recognized that state officials deserved greater leniency and deference during the early stages of the COVID-19 pandemic when the Challenged Proclamations were issued:

> For months now, States and their subdivisions have responded to the pandemic by imposing unprecedented restrictions on personal liberty, including the free exercise of religion.  This initial response was understandable.  In times of crisis, public officials must respond quickly and decisively to evolving and uncertain situations.

> At the dawn of an emergency—and the opening days of the COVID–19 outbreak plainly qualify—public officials may not be able to craft precisely tailored rules. Time, information, and expertise may be in short supply, and those responsible for enforcement may lack the resources needed to administer rules that draw fine distinctions.  Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules.  In general, that is what has happened thus far during the COVID–19 pandemic.

140 S. Ct. at 2604-05 (Alito, J., with whom Thomas and Kavanaugh, JJ., joined, dissenting).

*Accord Roman Catholic Diocese*, 141 S. Ct. at 70 (recognizing *South Bay I* "address[ed] different circumstances" in pandemic's "early stages") (Gorsuch, J., concurring); *South Bay I*, 140 S. Ct. at 1614 (requiring deference to state officials in matters "fraught with medical and scientific uncertainties," when responding to "changing facts on the ground") (Roberts, C.J., concurring).

As another district court held in dismissing similar claims brought by Spell's counsel in Alabama, the Governor's "actions cannot be viewed in a vacuum for purposes of qualified immunity."  *Case v. Ivey*, No. 2:20-CV-777-WKW, 2021 WL 2210589, at \*20 (N.D. Ala. June 1, 2021), *appeal docketed*, No. 21-12276 (11th Cir. July 2, 2021).  The Governor relied upon the advice of public health officials in issuing his orders and modified the orders to respond to the changing conditions, which allowed for increased capacity limits at churches and other faith-based organizations over time.  The Court should dismiss the claims against the Governor, individually, because the Challenged Proclamations did not violate Plaintiffs' clearly established constitutional rights and his response to the "novel" coronavirus is entitled to deference.

### D. The Challenged Proclamations Did Not Violate Spell's Free-Exercise-of-Religion Rights.

Even if Plaintiffs' claim for injunctive relief is not moot and the Governor is not entitled to qualified immunity, they have no right to injunctive relief and no claim for damages because the Challenged Proclamations did not violate their constitutional rights.  The Amended Complaint mentions the Challenged Proclamations, but it does not seek to enjoin or claim damages due to

13

any particular Proclamation.  Plaintiffs have not amended their complaint since they filed the Amended Complaint and, therefore, have not directly challenged any subsequent Proclamation.

### (1)   The Challenged Proclamations were neutral, generally applicable, and rationally related to a legitimate public purpose.

The "right to free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"  *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (citation omitted).  A neutral and generally applicable law that incidentally burdens a religious practice does not violate the Free Exercise Clause if the law is reasonably related to a legitimate state interest.  *Church of the Lukumi Babulu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 (5th Cir. 2001) (holding school uniform policy did not violate free exercise rights).  Spell's church must comply with the Governor's Proclamations just as it must comply with the State's building, life-safety, and zoning laws.  *See Smith*, 494 U.S. at 888-89.

The neutrality requirement asks whether the law's "object . . . is to infringe upon or restrict practices *because of* their religious motivation" either facially or operationally.  *Lukumi*, 508 U.S. at 534 (emphasis added).  "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."  *Id.*  A law lacks operational neutrality if it is intended, i.e., "targeted" and "gerrymandered," to impose a "gratuitous" impact on religious practices.  *Id.* at 535-42.

The Challenged Proclamations are both facially and operationally neutral—they restricted both religious and non-religious *indoor gatherings* and required individuals to wear masks and socially distance in both religious and non-religious settings.  Unlike in *Roman Catholic Diocese*, the Challenged Proclamations did not single out or target religious gatherings for discriminatory

treatment.  *See supra* at 2-5.  Thus, the Challenged Proclamations reveal no animosity towards religion, in general, or Spell in particular.  *See Lukumi*, 508 U.S. at 542.

General applicability is "interrelated" with neutrality.  *Id.* at 531.  Just as a law must be neutral towards religious conduct, government may not selectively burden only religiously motivated conduct in pursuing legitimate interests.  *Id.* at 543.  "[G]overnment regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise."  *Tandon*, 141 S. Ct. at 1296.  "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. . . . Comparability is concerned with the risks various activities pose, not the reasons why people gather."  *Id.*

The Challenged Proclamations treated churches the same as or better than other comparable, similarly situated businesses.  To stem the spread of the coronavirus, the Governor did not restrict the size of indoor gatherings "only against conduct with a religious motivation," *id.*, nor did he limit such gatherings "only when they [were] engaged in for religious reasons, or only because of the religious belief that they display."  *Smith*, 494 U.S. at 877.  Rather, the Governor's Proclamations sought to limit "all . . . gatherings in a single space at the same time where individuals will be in close proximity to one another." [4]  Proclamation No. 27 JBE 2020, § 1.  The Challenged Proclamations limited comparable gatherings because the public health officials upon whom the Governor relied, including the Centers for Disease Control, White House Coronavirus Task Force, and Louisiana Department of Health, had determined that these

---

[4] Although Plaintiffs complain about how the Challenged Proclamations allegedly prevented them from assembling for church services, Spell disobeyed the Governor's orders and "continued to preach to his congregation."  *Spell I*, 962 F.3d at 178.  Therefore, Spell cannot claim that he has suffered any damages from being prevented from assembling with his church.

settings—in which people gather for extended periods of time in close proximity and often to converse, sing, or hear speeches/sermons—presented the greatest risk for the spread of the virus.

None of the Challenged Proclamations defined churches or other faith-based organizations as "non-essential" businesses. The Proclamations preceding the Stay-at-Home Orders did not reference religious activities at all, and the Stay-at-Home Orders mentioned religious practices only in allowing travel to and from a place of worship as an "essential activity," a designation all subsequent Proclamations retained. Proclamation No. 58 JBE 2020, § 2(B)(5). The Phase 1 Order limited attendance to 25% of a church's permitted occupancy just as it did for other businesses that involved people congregating or required people to work in close proximity to one another. *See South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) ("*Spell II*") (denying injunction application "with respect to the percentage capacity limitations" and refusing to enjoin "a 25% capacity limitation on indoor worship services"). Even before the Governor issued the Phase 1 Order, churches could also conduct services outside without being subject to the gathering-size limits applicable to secular gathers. Religious organizations were also never prevented from conducting services or otherwise "meeting" or ministering to their congregants by phone, on-line, or in person either individually or in small groups.

Throughout the time the Challenged Proclamations were in effect, the Governor's orders treated churches and other faith-based organizations the same as—or better than—other comparable secular businesses in which people ordinarily gather in a single place, at the same time (usually for extended periods of time), and in close proximity to one another. Unlike churches, comparable secular businesses, such as concert halls, movie theaters, stadiums and arenas, and even restaurants and bars, were closed to the public for much of this period. *See Tandon*, 141 S. Ct. at 1298 (Kagan, J., dissenting); *South Bay I*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring);

*Attorney General William Barr Issues Statement on Religious Practice and Social Distancing* (Apr. 14, 2020), https://bit.ly2RIYzHO (stating that religious gatherings should be treated as similar non-religious gatherings, such as "movie theaters, restaurants, concert halls, and other comparable places of assembly"). To the extent the Challenged Proclamations treated any other "buildings" or "businesses" differently, such as "office buildings" or "factories," they involved "dissimilar activities . . . in which people neither congregate in large groups nor remain in close proximity for extended periods." *South Bay I*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

The Supreme Court's per curiam opinions in *Tandon* and *Roman Catholic Diocese* involved very different governmental orders and facts and, therefore, are inapposite. In *Tandon*, the Supreme Court enjoined California's ban on at-home religious services of more than three households. 141 S. Ct. at 1296. The majority expressly found that the California law granted more favorable treatment to secular activities that it considered directly comparable to at-home religious services, including "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants." *Id.* at 1297. In contrast, the Governor's Stay-at-Home Orders closed all restaurants (for onsite consumption), bars, casinos, video poker establishments, movie theaters, gyms, personal care and grooming businesses, and stores providing non-essential services and products.[5] *See* Proclamation No. 33 JBE 2020, § 4.

*Roman Catholic Diocese* is similarly distinguishable. The rules at issue there were neither neutral nor generally applicable. The Supreme Court emphasized that New York's governor had "single[d] out houses of worship for especially harsh treatment." *Roman Catholic Diocese*, 141

---

[5] Proclamation Nos. 27 JBE 2020 and 30 JBE 2020, which limited gatherings to 250 and 50 people, respectively, exempted airports, medical facilities, shopping centers and malls, office buildings, factories and manufacturing facilities, and grocery and department stores. These Proclamations were in effect for only ten days at the very outset of the pandemic. Even if these activities could be deemed comparable to indoor religious services, which the Governor disputes, the exemptions do not render the Proclamations unconstitutional. *See infra* at 19-20 (citing *Calvary Chapel*, 140 S. Ct. at 2605 (Alito, J., dissenting)).

S. Ct. at 66.  New York imposed strict 10-person and 25-person numerical limitations on religious services at houses of worship in specified zones, which the Supreme Court characterized as "far more restrictive than any COVID-related regulations that have previously come before the Court . . . and far more severe than has been shown to be required to prevent the spread of the virus at the applicants' services."  *Id.* at 67.  Governor Cuomo had even made "statements . . . in connection with the challenged rules [that could] be viewed as targeting the 'ultra-Orthodox [Jewish] community.'"  *Id.* at 66 (citation omitted).  Spell has not alleged that Governor Edwards targeted his church, and, in fact, the Governor's Proclamations, as a whole, demonstrate quite the opposite.

Other recent opinions from the Supreme Court support dismissal of Plaintiffs' free-exercise claims.  In *South Bay II*, for example, the Supreme Court refused to enjoin either a 25% capacity limitation on indoor religious services or a prohibition on singing and chanting during indoor services.  141 S. Ct. at 716.  The Court enjoined California's absolute prohibition on indoor worship services, but the Challenged Proclamations did not prohibit all indoor services, treated churches the same as or better than comparable activities, and expired less than four months after the onset of the pandemic in Louisiana.  Likewise, in *Calvary Chapel*, the Supreme Court denied an application to enjoin Nevada's 50-person limit on religious services even though it permitted other businesses, including casinos, to operate at 50% capacity—again, a far more restrictive rule than any the Governor imposed under the Challenged Proclamations.  Accordingly, the Court should dismiss Plaintiffs' free-exercise claims because the Challenged Proclamations did not violate their constitutional rights under the rational-basis test.

        **(2)      Alternatively, the Challenged Proclamations were narrowly tailored to serve a compelling state interest.**

The Challenged Proclamations did not violate Spell's free-exercise rights even if viewed through the lens of strict scrutiny (a standard that does not apply).  Under that test, a challenged

restriction "must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Catholic Diocese*, 141 S. Ct. at 67.  The Supreme Court has acknowledged that "[s]temming the spread of COVID-19 is unquestionably a compelling interest. . . ." *Id.*

*Roman Catholic Diocese* recognized that the types of restrictions imposed in Louisiana since the Governor issued the Phase 1 Order have been sufficiently "narrowly tailored" to pass constitutional muster.  *See supra* at 12 (distinguishing New York's unique restrictions from those in Nevada and California).  In rejecting New York's severe limits, the Supreme Court acknowledged that less-restrictive limitations tying gathering size to building occupancy limits for churches and other comparable businesses, such as in the Phase 1 Order, are narrowly tailored to fight the pandemic and, therefore, are constitutional under the strict-scrutiny test.

The earlier Challenged Proclamations, i.e., 27 JBE 2020, 30 JBE 2020, and 33 JBE 2020, likewise did not violate Spell's free-exercise rights even under the strict-scrutiny test.  These Proclamations were in effect for only the first three months of the pandemic in Louisiana as the disease surged from one case to over 30,000 cases and 2,242 known deaths.  *See* Rec. Doc. 21 at 4-7.  At that time, both the virus and the public health community's understanding of it were rapidly evolving, and yet the Governor had to respond to the rapidly spreading virus.  The Court should view these short-lived Proclamations through this "temporal lens," not in a "vacuum." *Case*, 2021 WL 2210589, at *17 & 20 (holding governor had qualified immunity for early orders).

At worst, Proclamation Nos. 27 JBE 2020, 30 JBE 2020, and 33 JBE 2020 should be "tolerate[d]" as the kind of "imprecisely tailored rules" that state governments "understandabl[y]" adopted "in the opening days of the COVID-19 outbreak," when they had to "respond quickly and decisively to evolving uncertainties," without the necessary "[t]ime, information, and expertise . . . to administer rules that draw fine distinctions."  *Calvary Chapel*, 140 S. Ct. at 2605 (Alito, J.,

dissenting).  Importantly, while *Roman Catholic Diocese* recognized the Court's "duty to conduct a serious examination of the need for" the restrictions imposed by the Proclamations, it also reaffirmed that judges "are not public health experts, and . . . should respect the judgment of those with special expertise and responsibility in this area," especially in the early days of the pandemic *Id.*  The Challenged Proclamations are constitutional under any applicable standard.

### (3)    Plaintiffs' free-exercise rights are not absolute.

To the extent Plaintiffs contend that the Governor could not impose *any* restrictions on their right to assemble for church services, that is, they have an *absolute* right to determine whether or not to assemble for church, they did not plead that claim, and, even if they did, they would be wrong as a matter of law.  While the freedom of religious belief is absolute, the freedom of religious conduct is not.  Over a century ago, the Supreme Court upheld the criminal conviction of a member of the Church of Jesus Christ of Latter-Day Saints for polygamy, stating:

> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.  Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?

*Reynolds v. United States*, 98 U.S. 145, 164 (1878); *see also id.* at 166-67; *Bowen v. Roy*, 476 U.S. 693, 699 (1986); *Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 200 (5th Cir. 1984).  Thus, the regulation of religious conduct has been permitted "when the conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order."  *Sherbert v. Verner*, 374 U.S. 398, 403 (1963).[6]

---

[6] In invoking the founding fathers James Madison and Thomas Jefferson, Spell ignores that they too acknowledged that the free exercise of religion could not "prevail" where it trespassed on "private rights or the public peace" (Madison) or broke "out into overt acts against peace and good order" (Jefferson).  Rec. Doc. 58 at 21-23.  Spell's decision to hold mass gatherings and ignore social distancing and mask wearing, during the pandemic, poses a direct threat to the public.  Madison's and Jefferson's teachings directly contradict Spell's absolutist interpretation of free exercise.

### E.    The Challenged Proclamations Did Not Violate Spell's Establishment-Clause Rights.

Spell alleges that the Challenged Proclamations also violated the First Amendment's Establishment Clause by preventing him from conducting certain religious services.  Rec. Doc. 58 ¶ 91.   Spell's argument is incorrect factually and legally.   All the Proclamations recognized traveling to places of worship as an "essential activity" and permitted people to do so.  Although the Challenged Proclamations limited the number of people who could gather at a church at one time, none prohibited church attendance or prevented churches from ministering to their congregants outside large indoor gatherings.  So, the very premise of Spell's argument is wrong.

Moreover, "[t]o withstand an Establishment Clause challenge, a statute must have a secular legislative purpose, the statute's primary purpose must neither advance nor inhibit religion, and the statute must not foster an excessive entanglement with religion."  *Littlefield*, 268 F.3d at 275 (rejecting Establishment-Clause challenge to school uniform policy).   The purpose of the Challenged Proclamations was to reduce the spread of COVID-19 and protect the public health and safety of the citizens of Louisiana—a compelling state interest. *See supra* at 19.  Finally, the Proclamations did not foster governmental entanglement with religion; they only addressed places of worship in either treating them the same as or more favorably than other comparable activities.

### F.    The Challenged Proclamations Did Not Violate Spell's Speech, Assembly, or Equal-Protection Rights.

Spell also pleads that the Challenged Proclamations violated his assembly, speech, and equal-protection rights.  Rec. Doc. 58 ¶¶ 92-96 (assembly), 97-102 (speech), & 103-09 (equal protection).  Spell's freedom-of-assembly and freedom-of-speech claims mirror and effectively repeat his free-exercise claim.  Spell's equal-protection claim, which alleges that the Proclamations treated dissimilar businesses differently, is similarly no different than his free-exercise claim.

The government may impose reasonable restrictions on the time, place, and manner of speech and assembly if they are justified without reference to their content, are narrowly tailored to serve a significant governmental interest, and allow for ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Lighthouse Fellowship Church v. Northam*, 458 F. Supp. 3d 418, 436-47 (E.D. Va. 2020). Where, as here, the state establishes restrictions "designed to promote the public convenience in the interest of all," an individual cannot disregard them "by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection." *Cox v. Louisiana*, 379 U.S. 536, 554 (1936). Spell ignores this important principle.

The Challenged Proclamations did not target any particular speech or expressive conduct and are content neutral. The Governor placed various crowd-size limitations on Plaintiffs and others but did not limit what Plaintiffs could say or how they could meet based upon the purpose of their speech or gatherings. Rather, the Proclamations limited the size of all gatherings to promote the government's compelling interest in slowing the spread of COVID-19 in Louisiana.

The Challenged Proclamations also met the time/place/manner standard of narrow tailoring. That "requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quotation and citation omitted); *Moore v. Brown*, 868 F.3d 398, 404 (5th Cir. 2017) (same). Louisiana's substantial interest in protecting the health and safety—and saving the lives—of its citizens by slowing the spread of this disease would have been achieved less effectively if people were permitted to gather in large groups as they did before the pandemic. Moreover, as with Plaintiffs' free-exercise claims, these claims should be viewed in the context of when the Governor issued the Challenged Proclamations. *See supra* at 19-20.

22

Despite the limitations imposed on the size of groups that could meet, the Proclamations provided ample alternative channels for Spell and his congregants to meet and express their beliefs. The Challenged Proclamations did not ban "any particular manner or type of expression at a given place or time." *Ward*, 491 U.S. at 802. Under the Proclamations, Spell and his congregants could gather in smaller groups multiple times a day or week, communicate through mail and email, livestream services, post services on YouTube, Facebook, and other free internet platforms, or maintain their community in any combination of these ways. The "First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places," and alternative venues and means of communication do not deny those rights just because they are not Spell's "preferred" venues/means or may reduce his "potential audience." *International Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 371-72 (5th Cir. 2010). The Challenged Proclamations did not infringe Plaintiffs' rights, and, therefore, this Court should dismiss these additional claims.

## G. The Eleventh Amendment Bars Spell's State-Law and Injunction Claims.

### (1) The Court lacks jurisdiction over Plaintiffs' claims for relief based upon state law under the Eleventh Amendment.

The Amended Complaint also alleges that the Challenged Proclamations violated Louisiana constitutional and statutory law. *See* Rec. Doc. 58 ¶¶ 117-53. The "Eleventh Amendment and the principle of sovereign immunity that it embodies" limit the jurisdiction of federal courts.[7] *Vogt v. Board of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002). Where, as here, a state has not waived its Eleventh Amendment immunity, *see* La. Rev.

---

[7] The supplemental jurisdiction statute, 28 U.S.C. § 1367, does not "constitute a clear statement of an intent to abrogate state sovereign immunity" or "extend to claims against nonconsenting state defendants." *Raygor v. Regents of Univ. of Minn.*, 543 U.S. 533, 541, 542 (2002).

STAT. § 13:5106(a), a state may not be sued in federal court.  *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).  This immunity extends to state officials, such as the Governor, in suits, like this one, in which the "state is a real, substantial party in interest."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).  "A plaintiff may not avoid [the Eleventh Amendment] simply by naming an individual state officer as a party in lieu of the State."  *Okpalobi v. Foster*, 244 F.3d 405, 412 (5th Cir. 2001) (en banc).  The Court lacks jurisdiction over these claims and, therefore, should dismiss them.

In particular, "federal courts are without jurisdiction to enjoin enforcement of an executive order allegedly issued in violation of state law."  *Big Tyme*, 985 F.3d at 460 n.2 (citing *Pennhurst*, 465 U.S. at 104-06); *see also McKinley, D.C. v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011).  The importance of the constitutional protection afforded states under the Eleventh Amendment requires strict enforcement of these requirements.  *Pennhurst*, 465 U.S. at 106.  Therefore, the Court should dismiss Spell's state-law claims.[8]

### (2)    The Eleventh Amendment bars injunctive relief against the Governor because he is not responsible for enforcing the Proclamations.

The Eleventh Amendment also bars claims for injunctive and declaratory relief against a state official, unless the official, "'by virtue of his office,'" has "'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a

---

[8] Nonetheless, the result would be no different under Louisiana law.  The Louisiana and United States Constitutions provide similar protections for religion, speech, and assembly, and the Challenged Proclamations no more violated the former than they did the latter.  *See Rodrigue v. Copeland*, 475 So.2d 1071, 1079-80 (La. 1985); *Seegers v. Parker*, 241 So.2d 213, 216 n.4 (La. 1970).  Spell's state statutory argument is also equally wrong because it misreads the Louisiana Homeland Security and Emergency Assistance and Disaster Act.  Section 29:736(D) of that act does not forbid any order that encroaches, even to the smallest extent, on state constitutional rights.  The act itself disproves this argument by permitting the State to "diminish" various rights during a crisis.  At most, § 29:736(D) prohibits only unconstitutional restrictions on protected rights, which Spell cannot prove.

representative of the state, and thereby attempting to make the state a party.'" *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). Spell does not allege that the Governor was responsible for enforcing the Challenged Proclamations or actually enforced them against him, merely that the Governor issued the orders, which others enforced. *See Morris v. Livingston*, 739 F.3d 740, 745-46 (5th Cir. 2014). Accordingly, Spell has no right to injunctive relief, and the Court should dismiss that claim.

## III.    CONCLUSION

Defendant John Bel Edwards respectfully requests that this Court dismiss Plaintiffs' claims against him with prejudice. *See Elim Romanian Pentecostal Church v. Pritzker*, No. 20 C 2782, 2021 WL 3142111, at *4 (N.D. Ill. July 26, 2021); *Case*, 2021 WL 2210589, at *9-12, *17-20.

Respectfully submitted,

JEFF LANDRY
Attorney General

By:  /s/ James M. Garner

| | |
|---|---|
| JACK M. WEISS (# 13340) | JAMES M. GARNER (# 19589), T.A. |
| *Lead Counsel* | DARNELL BLUDWORTH (# 18801) |
| Attorney at Law | JOSHUA S. FORCE (# 21975) |
| 5938 Laurel Street | CHRISTOPHER T. CHOCHELES (# 26848) |
| New Orleans, LA 70115 | **SHER GARNER CAHILL RICHTER** |
| Telephone/Facsimile: (504) 267-0637 | **KLEIN & HILBERT, L.L.C.** |
| Email:          jack1656@gmail.com | 909 Poydras Street, 28th Floor |
| Special Assistant Attorney General | New Orleans, Louisiana  70112-1033 |
| | Telephone:     (504) 299-2100 |
| MATTHEW F. BLOCK (# 25577) | Facsimile:     (504) 299-2300 |
| Executive Counsel | Email:          jgarner@shergarner.com |
| Office of the Governor | dlbudworth@shergarner.com |
| Louisiana State Capitol | jforce@shergarner.com |
| 4th Floor | cchocheles@shergarner.com |
| Baton Rouge, Louisiana 70804 | Special Assistant Attorneys General |
| Telephone:     (225) 342-7015 | |
| Email:          matthew.block@la.gov | |

Attorneys For Defendant
GOVERNOR JOHN BEL EDWARDS

25