**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| MARK ANTHONY SPELL; LIFE TABERNACLE CHURCH, | ) ) ) |
| Plaintiffs, | ) ) ) Case No. 3:20-cv-282-BAJ-EWD |
| v. | ) ) |
| JOHN BEL EDWARDS, et al. | ) ) ) |
| Defendants. | ) |

_____

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
ON REMAND FROM THE FIFTH CIRCUIT**

_____

Plaintiffs Mark Anthony Spell and Life Tabernacle Church oppose Defendants' motions

to dismiss for the following reasons:

- This Court has jurisdiction to grant permanent injunctive relief for Plaintiffs' claims;

- Defendants are not entitled to Qualified Immunity from damages for completed constitutional violations because each Defendant acted outside his discretionary authority and violated clearly established constitutional rights;

  o The text, history, and leading precedents concerning the Religion Clauses of the First Amendment show that the civil government has no jurisdiction to tell a church whether it may meet or not;

  o Defendants have also violated Plaintiffs' rights to freedom of assembly, freedom of speech, and equal protection of the law.

  o Louisiana law specifically prohibits the government from trespassing upon constitutional rights during emergencies and thus Defendants acted outside their discretionary authority;

  o Defendants are not entitled to qualified immunity because this is a case of "obvious clarity." *See Brousseau v. Haugen*, 543 U.S. 194, 199 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).

- The three cases the Fifth Circuit specifically mentioned in its order, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 63 (Nov. 25, 2020), *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (Feb. 5, 2021), and *Tandon v. Newsom*, 141 S. Ct. 1294, 1294 (April 9, 2021), all hold that disparate treatment such as Governor Edwards encouragement of thousands of protestors while simultaneously restricting Plaintiffs to mere dozens for their religious worship is unconstitutional.

Pursuant to Local Civil Rules 7(f)&(g), Plaintiffs also submit the attached memorandum discussing these points in further detail.

Respectfully submitted this 8th day of September, 2021.

/s/ Roy S. Moore
Roy S. Moore, ABA #6532R53R
*Attorneys for Plaintiffs*
FOUNDATION FOR MORAL LAW
1 Dexter Ave.
Montgomery, Alabama 36104
334-262-1245
kayla@morallaw.org

/s/Jeffrey S. Wittenbrink
Jeffrey S. Wittenbrink, LSBA # 18511
*Local Counsel, Attorney for Plaintiffs*
*with Foundation for Moral Law*
524 Baird Drive
Baton Rouge, Louisiana 70808
225-308-6850
jwittenbrink@thelawyerbr.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| MARK ANTHONY SPELL; LIFE TABERNACLE CHURCH, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 3:20-cv-282-BAJ-EWD |
| v. | ) ) | |
| JOHN BEL EDWARDS, et al. | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' MOTION TO DISMISS
ON REMAND FROM THE FIFTH CIRCUIT**

## I.    FACTS

### A.    Background

Pastor Spell is the pastor of Life Tabernacle Church in the City of Central, Louisiana. (V.Compl. 3). Life Tabernacle Church is a large church composed of more than 2,000 people. (V.Compl. Ex. B 2). Pastor Spell and the Church have the sincere religious belief that the Bible requires them to meet in person in their church building. (*See* V.Compl. 5, Ex. B 2-4). They also have the sincere religious beliefs that baptisms, communion, the offering, laying on of hands, anointing the sick with oil and praying for them must be done in person in a church assembly. (*See* V.Compl. 5-6, 20).

During the COVID-19 outbreak, Governor Edwards issued a series of proclamations that severely restricted Pastor Spell and the Church from meeting together as they had been doing. (V.Compl. Ex. A). On March 13, 2020, Governor Edwards issued his first order that addressed churches by implication, prohibiting "all gatherings of 250 people or more," which applied to "gatherings in a single space at the same time where individuals will be in close proximity to one

another." (Proclamation Number JBE 2020-27). Three days later, he reduced the number of people permitted to gather to 50. (V.Compl. Ex. A (reproducing Proclamation Number JBE 2020-30)). By the time this litigation commenced, Governor Edwards had prohibited all gatherings of 10 people or more if the people in the gathering would be in a single space at the same time and in close proximity to one another. (*See id.* (reproducing 41 JBE 2020 § 2(A)). Each of these orders exempted a number of entities such as airports, shopping malls, medical facilities, office buildings, factories, grocery stores, and department stores—but not churches. (*See id.* (reproducing JBE 2020-30 § 1 & 41 JBE 2020 § 2; *see also* JBE 2020-27 § 1).

Refusing to violate their religious convictions, Pastor Spell and Life Tabernacle Church continued to meet in person. (V.Compl. 6-10). On March 17, 2020, Chief Fire Marshall Butch Browning visited Pastor Spell's house, relaying a message from Governor Edwards to discontinue services. (V.Compl. 6). After Pastor Spell declined to discontinue services, Sheriff Gautreaux visited with Pastor Spell, threatening to arrest him if he continued to hold services.[1] *Id.* During this time, two church buses were vandalized, but the police did essentially nothing in response. (V.Compl. 6-7).

On March 31, Defendant Corcoran issued Pastor Spell six misdemeanor summonses for violating Governor Edwards's orders, each punishable by a fine of $500 and/or up to 90 days in jail. (V.Compl. 7). On April 21, 2020, Defendant Corcoran arrested Pastor Spell on charges of aggravated assault (even though no confrontation, threat, or physical contact occurred) after he attempted to confront a lone protestor outside his church who had been making obscene remarks and vulgar gestures to the Church's women and children. (*See* V.Compl. Ex. B). The presence of the lone protestor and his actions had been reported to police authorities, but no actions were

---

[1] Sheriff Gautreaux disputes this fact.

taken to remove him. (V.Compl. 8). Pastor Spell was released on bail but told by Judge Fred Crifasi of the Louisiana 19th Judicial Circuit that as a condition of his bail he could not preach to "such an assembly [more than 10 people] in person…that's prohibited."[2] When Pastor Spell could not assent to these terms, Judge Crifasi placed Pastor Spell under house arrest and had him equipped with an ankle bracelet to track his location. (V.Compl. 9-10). Defendant Corcoran informed Pastor Spell that if he left his home, he would be arrested. (V.Compl. 9).

Following his religious conviction that he must obey God rather than man, Pastor Spell went to his church and conducted a service on April 26, 2020. (V.Compl. 10). Judge Crifasi threatened to increase his bail by $25,000, but he subsequently recanted after Pastor Spell refused to assent. *Id.* Although Judge Crifasi refused to immediately put Pastor Spell in jail, he said that he would later consider the issue of contempt and revocation of bond, which presumably would put Pastor Spell's liberty in jeopardy once again. *Id.*

## B.    The Plaintiffs Sue

Having already suffered one felony charge[3] and six misdemeanor charges against Pastor Spell, the Plaintiffs brought the present action in the U.S. District Court for the Middle District of Louisiana on May 7, 2020, along with a motion for a TRO and PI.[4] On May 14, 2020, Judge Brian Jackson held a hearing over Zoom concerning the Plaintiffs' motion. Shortly after the hearing, Governor Edwards filed a motion to supplement the record with a new proclamation that would go into effect on May 15. The Governor's new proclamation allowed churches to

---

[2] Motion for Injunction Pending Appeal Ex. 5 at 13, *Spell v. Edwards*, No. 20-30358 (5th Cir. June 18, 2020).

[3] This charge was reduced to a misdemeanor after Plaintiffs sued in the present action.

[4] The Complaint also sued the Mayor Sharon Weston Broome of the City of Baton Rouge, Mayor David Barrow of the City of Central, and the Hon. Fred Crifasi, but the Plaintiffs later voluntarily dismissed these defendants.

open at 25% capacity to which Pastor Spell vigorously objected, continuing his services as before.

## C.    First Appeal and Motions to Dismiss

On May 15, Judge Jackson issued the TRO/PI Order denying the Plaintiffs' motion on the merits. Plaintiffs immediately appealed to the United States Court of Appeals for the Fifth Circuit, requesting an emergency injunction pending appeal. While pursuing an appeal for injunctive relief before the Fifth Circuit, fearing that Pastor Spell might be subject to arrest, citation, or other forms of punishment, Plaintiffs filed an amended complaint in this Court (Doc. 58). It was during the prosecution of the appeal and (the subsequent petition for an *en banc* rehearing) that Defendants filed their first motions to dismiss in this Court. *See* Doc. 74 (filed June 16, 2020), Doc. 76 (filed June 26, 2020), & Doc. 80 (filed July 6, 2020).

On June 18, 2020, the Fifth Circuit denied Plaintiffs' motion and dismissed the appeal.[5] *Spell v. Edwards*, 962 F.3d 175, 175 (5th Cir. June 18, 2020) ("*Spell I*"). The Fifth Circuit reasoned that the appeal was moot because the Governor's order had expired since the appeal was taken. *Id.* The court also rejected Plaintiffs' argument that the matter was capable of repetition but evading review, reasoning that Louisiana's trend had been to reopen the state instead of closing it back down. *Id.* at 180. Judge Ho reluctantly concurred, agreeing that the appeal was moot but noting problems with the Defendants' actions on the merits. *Id.* at 180-82. Plaintiffs filed a petition for an *en banc* rehearing on July 2, 2020, which was denied on July 15, 2020.

**D.    Subsequent Actions by Defendants**

After Plaintiffs' first appeal to the Fifth Circuit, from June 4, 2020, to September 11, 2020, each of Governor Edwards' proclamations restricted churches to 50% of their total occupancy as required by the State Fire Marshall. [6] Each noted that COVID cases were increasing during Phase 2 and that it may be possible that the State must return to the full lockdown restrictions of the stay-at-home order.[7] These orders also progressively restricted the ability for people to gather, even outdoors, and even imposed a statewide mask requirement.[8]

As Judge Ho noted in his concurrence, "[O]fficials have not only tolerated protests—they have encouraged them as necessary and important expressions of outrage over abuses of government power." *Id.* at 181. Judge Ho quoted the Governor when he commended the protesters engaging in these activities without following social-distancing rules, and he also noted that the Governor said he expected to see the protests continue. *Id.* at 182.

Judge Ho was correct. On July 4, "About 100 people marched down the levee in downtown Baton Rouge ...."[9] The photos of the event show that the protestors were clearly not following social-distancing requirements,[10] despite Governor's order to do so.[11] On July 15, a

---

[6] See Proclamations Nos. 83 JBE 2020 (issued June 25, 2020), 89 JBE 2020 (issued July 11, 2020, requiring facial coverings), 96 JBE 2020 (issued July 23, 2020), 101 JBE 2020 (issued Aug. 6, 2020), and 110 JBE 2020 (issued Aug. 26, 2020).

[7] *See* 83 JBE 2020 at 2, 89 JBE 2020 at 2, 96 JBE 2020 at 2, 101 JBE at 1-2, and 110 JBE at 2.

[8] *See* 83 JBE 2020 at 6 ("[S]ocial distancing shall be practiced in any crowd size"); 89 JBE 2020 at 2-3 ("Crowd sizes are limited to no more than 50 people in any single outdoor space where individuals will be in close proximity to one another and unable to maintain strict social distancing of six feet apart from individuals who are not immediate household members."); 96 JBE 2020 at 5-6 (same); 101 JBE 2020 at 6 (same); 110 JBE 2020 at 6 (same).

[9] Emma Kennedy, *Black Lives Matter Protestors March Along the Levee to Protest Fourth of July Celebrations*, The Advocate (July 4, 2020), https://www.theadvocate.com/baton_rouge/news/article_d18a4966-be58-11ea-a603-a79f057688c1.html.

[10] *Id.*

group of about 100 protestors that again failed to follow social distancing rules marched to the Baton Rouge police headquarters.[12] The police arrested some only after they trespassed onto the police station's property but told them they were free to protest as long as they did not trespass, making no mention of the social distancing rules or Governor Edwards' order.[13] Finally, on August 26, 2020, 75 people, who were not social distancing, gathered outside the federal courthouse in Lafayette to protest the shooting of Trayford Pellerin.[14] The protestors were allowed to continue despite Governor Edwards' limitation of 50 people if social distancing could not be followed.[15]

On September 11, Governor Edwards issued another proclamation which allowed churches to meet at 75% capacity under "Phase 3."[16] It was not until March 2, 2021, that the Governor removed all assembly restrictions on churches.[17] Notably, the Governor reinstated a statewide mask mandate shortly after the filing of his present motion to dismiss which does not exempt churches from the restriction itself (§ 3(C)), but does exempt churches from being cited for violating the requirement (§ 3 (E)).[18] The order also notes "Louisiana has the highest case rate in the United States," as well as a "significant risk posed by the Delta variant . . . even

---

[11] See 83 JBE 2020, quoted in note 8, *supra*.
[12] Lea Skene, *Watch: Protestors Detained in Baton Rouge for Refusing to Move off of BRPD Property*, The Advocate (July 15, 2020), https://www.theadvocate.com/baton_rouge/news/crime_police/article_c57efdae-c6cf-11ea-803d-e7036706c59c.html.
[13] *Id.*
[14] Katie Gagliano, *In Spite of Hurricane Laura, Protestors Resume Fight for Accountability in Lafayette Police Shooting*, The Advocate (Aug. 26, 2020), https://www.theadvocate.com/acadiana/news/article_049f6f2c-e7ce-11ea-8ea7-43f3882a7f61.html.
[15] *See* 96 JBE 2020, quoted in note 8, *supra*.
[16] Proclamation No. 117 JBE 2020.
[17] Proclamation No. 29 JBE 2021.
[18] Proclamation No. 137 JBE 2021.

among those who are vaccinated."[19] Additionally, the Governor noted that Louisiana is at "the highest number of hospitalized COVID-19 patients during the pandemic, without any signs that the increase is slowing,"[20] which indicates there is a real and substantial threat that the Governor will return to previous restrictions, including church restrictions.

## E.    Second Appeal and Present Remand

On November 13, 2020, this Court dismissed Plaintiffs' claims with prejudice, (Doc. 96), Plaintiffs filed a second appeal to the Fifth Circuit on November 13, 2020. After briefing and oral argument, on June 11, 2021, the Fifth Circuit vacated this Court's dismissal and remanded with instructions for this Court to analyze the plaintiffs' claims for damages in light of Supreme Court authority. *Spell v. Edwards*, 849 F. App'x 509, 510 (5th Cir. 2021) (per curiam). Additionally, the Fifth Circuit noted that Defendants' immunity claims should be reviewed "in the first instance." *Id.*

## II.    STANDARD

We construe facts in the light most favorable to the nonmoving party, as a motion to dismiss under 12(b)(6) "is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.,* 563 F.3d 141, 147 (5th Cir. 2009) (quotation marks and citation omitted). Dismissal is appropriate only if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To satisfy this standard, the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." *Colony Ins. Co.,* 647 F.3d at 252. Yet, it must allege enough facts to move the claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. Determining whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).[21]

---

[19] *Id.*

[20] *Id.*

[21] *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (footnote omitted).

As for the claims that Defendants seek to dismiss under Rule 12(b)(1), Fed. R. Civ. P., "a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."[22] Furthermore,

> [w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.... This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice.... The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction.[23]

## III.    ARGUMENT

### A.    Introduction

For over a year of litigation but still in the pleadings stage, the Governor continues to argue that restricting church assembly was fully constitutional simply due to an ongoing "*unprecedented worldwide pandemic*."[24] However, not only is COVID-19 affirmatively *not unprecedented in fact* as a worldwide pandemic (Spanish flu killed approximately 675,000 nationwide from 1918-1920; COVID-19 has allegedly killed approximately 660,000),[25] the Supreme Court precedent established in the intervening century demonstrates that the First Amendment places *the decision of whether to assemble* solely within the jurisdiction of the Church, not the State. Plaintiffs have sufficiently plead facts showing plausible claims to relief

---

[22] *Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001).

[23] *Id.* (citations omitted).

[24] Doc. 119 at 10 (emphasis original).

[25] Ethan Young, Are Covid Fatalities Comparable with the 1918 Spanish Flu?, American Institute for Economic Research (April 27, 2021), https://www.aier.org/article/are-covid-fatalities-comparable-with-the-1918-spanish-flu/. Adjusted for population growth, Spanish Flu would have killed 4x the number of Americans with our current population.

against Defendants under the Establishment, Free Exercise, freedom of speech, freedom of assembly, and Equal Protection clauses.

**B.    Governor Edward's Motion to Dismiss**

    *1.    This Court has jurisdiction to grant permanent injunctive relief for Plaintiffs' claims.*

Permanent injunctive relief, unlike preliminary relief, is issued as final judgement in a case after a hearing on the merits.[26] Plaintiffs have acted diligently to obtain a hearing on the merits of their claims but have yet been able to receive one. Now on remand, a hearing on the merits of Plaintiffs' claims can reach the primary question of whether Plaintiffs succeed on the merits in order to then reach the question of whether a permanent injunction is appropriate.

At the time of the *Spell I* appeal, June 18, 2020, the Fifth Circuit was correct to say that "the trend in Louisiana has been to reopen the state, not close it down . . . ." *Id.* However, the Governor has shown that the Fifth Circuit's conclusion that "it is speculative, at best, that the Governor might reimpose the [Phase 1] restriction or a similar one" is wrong. *Id.* First, he broke the trend of reopening immediately after *Spell I* by tightening assembly restrictions in July 2020;[27] in the midst of the present litigation, the Governor did exempt churches, but nevertheless, the Governor's argument rests on a "trend of reopening" that is now nonexistent. The Governor's reinstatement of the Louisiana mask mandate (including churches, albeit exempting them from fines)[28] further demonstrates that there is a reasonable expectation that the constitutional violations in this case will recur.

---

[26] Bryan Garner, <u>Black's Law Dictionary</u> (11th ed. 2019).
[27] Proclamation No. 89 JBE 2020 (July 11, 2020).
[28] Proclamation No. 137 JBE 2021 (Aug. 2, 2021)

The Governor's reinstated mask mandate also notes "Louisiana has the highest case rate in the United States," as well as a "significant risk posed by the Delta variant . . . even among those who are vaccinated."[29] As the Governor acknowledges that Louisiana is at "the highest number of hospitalized COVID-19 patients during the pandemic, without any signs that the increase is slowing,"[30] there is a real and substantial threat that the Governor will return to previous restrictions, including church restrictions. The Governor's present motion to dismiss even cites authority that churches cause "super-spreader events." (Doc. 119 at 10). All of this combines to give Plaintiffs the reasonable expectation that, but for the present litigation, the Governor would quickly act to restrict churches again.

In this case, Plaintiffs are seeking the right for their entire congregation to meet in person in the church building. 100% of the Governor's orders from March 13, 2020, until March 2, 2021, denied them that right. Governor Edwards' orders since March 2, 2021, have not become more lenient but rather stricter because of the reinstated mask requirement, and because Louisiana is now at its highest number of COVID hospitalizations at any point, it is very likely that the Governor would reinstate church restrictions at the earliest opportunity.

2. *Governor Edwards is not entitled to qualified immunity from damages for his completed violations of constitutional rights*

Next, the Governor argues he is entitled to qualified immunity[31] to escape from damages from his completed constitutional violations which are ripe for adjudication. *Uzeugbunam v. Preczewski*, 141 S. Ct. 792, 792 (2021). "The good faith, qualified immunity defense is an

---

[29] *Id.*

[30] *Id.*

[31] As an original matter, the Supreme Court's "§1983 qualified immunity doctrine appears to stray from the statutory text." *Baxter v. Bracey*, No. 18-1287, slip op. at 1 (U.S. June 15, 2020) (Thomas, J, dissenting).

affirmative defense, and the burden of showing its applicability rests on the defendant officials."[32]

> The first step in the qualified immunity analysis is to determine whether the plaintiff has alleged the violation of a clearly established federal constitutional (or federal statutory) right.... If the plaintiff does so, the Court must then assess whether the defendant's conduct was objectively reasonable in light of clearly established law.... Unlike the first step, the step two inquiry applies the law that was clearly established at the time of the alleged violation. To ensure that qualified immunity serves its intended purpose, it is of paramount import, during step two, to define "clearly established law" at the proper level of generality....
>
> "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." .... The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff.[33]

The courts typically will not hold that a right is "clearly established" unless precedent exists to give an official fair warning that his conduct violated the law.[34]  However, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."[35] The text of a statute or the Constitution itself may be clear enough to give the fair warning that the qualified-immunity doctrine requires.[36]

---

[32] *Douthit v. Jones*, 619 F.2d 527, 533 (5th Cir. 1980).

[33] *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (citations omitted).

[34] *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).

[35] *Id.* at 741 (alteration, citations, and quotation marks omitted).

[36] *See Kinney v. Weaver*, 367 F.3d 337, 352 (5th Cir. 2004) (holding that the text of 42 U.S.C. § 1985 was clear enough to put reasonable officials on notice of what was required); *see also Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (holding that in obvious cases qualified immunity can be overcome "without a body of relevant case law."); *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (noting that in obvious clarity cases "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.").

This is a case of obvious clarity. The First Amendment, applicable to the States through the Fourteenth Amendment, provides, in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . or the right of the people peaceably to assemble." Plaintiffs will discuss the historical background of the Religion Clauses in particular and then address the obvious violations of each of these rights.

    a.   <u>Historical Background</u>

In *Everson v. Board of Education*, Justice Hugo Black clearly recognized that "*neither* [State or Federal government] *can force or influence a person to go to or remain away from church against his will . . .* [and that] *no person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance*." 330 US 1, 15-16 (1947) (emphasis added). Justice Black concluded the majority opinion by stating that, "the First Amendment has erected a wall of separation between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach." *Id.* at 18.

Even the *Everson* dissent agreed concerning the strict interpretation between religion and government, stating "Madison was certain in his own mind that under the Constitution 'there is not a shadow of right in the general government to intermeddle with religion,' and that 'this subject is, for the honor of America, perfectly free and unshackled. The Government has no *jurisdiction* over it.'" *Id.* at 38-39 (Rutledge, J., dissenting) (emphasis added, footnotes omitted).

The Supreme Court's recognition that religion is a jurisdictional matter comports with the Founding intent of the First Amendment. Citing the Virginia Declaration of Rights, James Madison defined "religion" as "the duty which we owe to our Creator and the manner of

discharging it." [37] Madison, "the leading architect of the religion clauses of the First Amendment,"[38] viewed freedom of religion as *jurisdictional* in nature, believing that neither civil society nor civil government could abridge duties that man owed to his Creator. [39] Because religion could be directed "only by reason and conviction, not by force or violence," the "religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate."[40] Thus, in Madison's view, the right to free exercise of religion should prevail "in every case where it does not trespass on private rights or the public peace."[41]

Thomas Jefferson likewise believed that the government had no business dictating religious beliefs or practices. Jefferson famously penned that the First Amendment built "a wall of separation between Church & State."[42] Sadly, this metaphor has been misconstrued in modern times to prevent the public acknowledgment of God while ignoring that the primary object of Jefferson's metaphor was to protect the church from the state. [43] In his Virginia Statute on Religious Liberty, Jefferson wrote that "to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of

---

[37] Madison, *Memorial and Remonstrance*, *supra* note 38.

[38] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184 (2012) (citations and internal quotation marks omitted).

[39] *See* James Madison, *Memorial and Remonstrance* (June 20, 1785); *see also* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1453 (1989) ("Madison advocated a jurisdictional division between religion and government based on the demands of religion rather than solely on the interests of society."). The United States Supreme Court attached Madison's *Memorial and Remonstrance* to its landmark opinion in *Everson v. Bd. of Educ. of the Twp. of Ewing*, 330 U.S. 1 (1947).

[40] *Id.*

[41] Letter from James Madison to Edward Livingston (July 10, 1822), in 9 *The Writings of James Madison* 98, 100 (G. Hunt ed. 1901).

[42] Letter from Thomas Jefferson to the Danbury Baptists (Jan. 1, 1802).

[43] *See Wallace v. Jaffree*, 472 U.S. 38, 106-07 (1985) (Rehnquist, J., dissenting).

their ill tendency, is a dangerous fallacy, which at once destroys all religious liberty[.]"[44] Jefferson acknowledged that the civil government had jurisdiction only "to interfere when principles break out into overt acts against peace and good order."[45] In the first major religious liberty case that the Supreme Court decided, the Court drew on these two sentences from Jefferson's statute and held, "In these two sentences is found the true distinction between what properly belongs to the church and what to the State."[46]

Madison and Jefferson's understanding of the First Amendment that government may only interfere with religion when it trespassed on private rights or broke out into overt acts against peace and good order does not mean what the Governor would like it to (Doc. 119 at 20 note 6), i.e., a blank check to restrict religious conduct whenever he personally decides it is a "direct threat to the public." Rather, "overt acts against peace and good order" has a specific historical meaning that Plaintiffs' conduct does not match whatsoever, such as historical offenses like polygamy or human sacrifice.[47] The Governor cannot make Plaintiffs' conduct of merely associating and worshipping according to their beliefs an "overt act against peace and good order" simply by comparing it to human sacrifice or polygamy. (Doc. 119 at 20). Plaintiffs have only asked to associate and worship peaceably in accordance with their sincerely held religious convictions.

In this case, nothing could more fundamentally belong to the church than the decision whether to assemble or not. As Judge Willett recently noted, "'Ekklesia,' the Greek word for

---

[44] Thomas Jefferson, *Virginia Statute on Religious Liberty* (Jan. 16, 1786).
[45] *Id.*
[46] *Reynolds v. United States*, 98 U.S. 145, 163 (1879).
[47] *Reynolds* 98 U.S. at 166.

church, means the gathered ones, an assembly of the faithful."[48] Christians have met faithfully for millennia in person, and assembling is "essential" to the religious beliefs of many people "about what it means to be a faithful Christian."[49]

Additionally, as an initial matter, all of the authority that Governor Edwards cites is inapposite for the purpose of what was clearly established at the time of his first church restriction, March 13, 2020, because every decision cited was subsequent in time (Doc. 119-2, at 1-5) (earliest decision was *Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100 (D.N.M. April 17, 2020). The Governor ignored 200 years of Constitutional precedent and the clear text of the First Amendment.

      b.      Free Exercise Clause

In *Employment Division v. Smith*,[50] Justice Antonin Scalia and a majority of the Supreme Court appeared to view the First Amendment as placing assembling for religious worship *completely* off limits. In *Smith*, the Court said,

> But the "exercise of religion" often involves not only belief and profession but the performance of (or abstention from) physical acts: *assembling with others for a worship service*, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation. *It would be true, we think (though no case of ours has involved the point), that a State would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons*, or only because of the religious belief that they display.[51]

---

[48] *First Pentecostal Church of Holly Springs v. City of Holly Springs*, No. 20-60399, slip op. at 3 n.1 (5th Cir. May 22, 2020) (Willet, J., concurring) (citation omitted); *accord On Fire Christian Center v. Fischer*, No. 3:20-cv-00264, slip op. at 14 (W.D. Ky. Apr. 11, 2020).
[49] *Tabernacle Baptist Church v. Beshear*, No. 3:20-cv-00033 (E.D. Ky. May 5, 2020).
[50] 494 U.S. 872 (1990).
[51] *Id.* at 879 (emphasis added).

The Court viewed the State as completely powerless to prohibit "assembling with others for a religious worship service" if it was "engaged in for religious reasons."[52] At that time (in 1990), "no case of [the Court's] had involved the point."[53] But that is exactly what is going on in this case. The Governor has banned assembling with others for a worship service when it is engaged in for religious reasons. *Smith* recognized that the State was powerless to issue such a command, and so should this Court.

The Governor applies the "valid and neutral law of general applicability" language of *Smith* in a vacuum to justify his church assembly restrictions, ignoring the Court's statement that "it is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns." (quoting *Roberts v. United States Jaycess*, 468 U.S. 609, 622 (1984), "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State [if] a correlative freedom to engage in group effort toward those ends were not also guaranteed"[54] Even the concurrence in *Smith* recognized that

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.[55]

The *Smith* Court clearly contemplated that Church assembly was separate and distinct.

For the sake of simplicity and constitutionally sound adjudication, the Court's analysis should end here. However, if the Court feels compelled to continue, then Plaintiffs would point it

---

[52] *Id.*
[53] *Id.*
[54] *Id. at 882.*
[55] *Id. at 903 (O'Conner, J., concurring).*

to Judge Ho's concurrence in the Fifth Circuit's decision dismissing Plaintiffs' appeal. Under *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,[56] the Governor may not forbid churches from assembling fully while not only allowing but encouraging protestors to do whatever they want. While the first appeal was pending before the Fifth Circuit, the Governor not only permitted but encouraged the protests concerning the death of George Floyd, in which social-distancing rules were flouted.[57] As noted above in Part I.D., these protests continued, and the Governor made no meaningful attempt to force the protestors to comply with the proclamations that he expects the Plaintiffs to follow. As Judge Ho concluded, "public officials cannot devalue people of faith while elevating certain protestors."[58]  That would not only offend the jurisdictional separation of Church and State but also the principle of equality for which the protests stand. The Supreme Court has ruled that such disparate treatment is unconstitutional in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 63 (Nov. 25, 2020), *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (Feb. 5, 2021), and *Tandon v. Newsom*, 141 S. Ct. 1294, 1294 (April 9, 2021) – each of which the Fifth Circuit specifically mentioned must be analyzed on remand.

c.    Establishment Clause

In 1947, the Supreme Court made its first major attempt to interpret and apply the Establishment Clause in *Everson v. Board of Education.*[59] Like the passage from *Smith* quoted above, the Court in *Everson* began its analysis by deducing basic rules about what the Establishment Clause requires, one of which was that the government may not "force [or]

---

[56] 508 U.S. 520 (1993).
[57] *Spell*, No. 20-30358, slip op. at 9-11 (Ho, J., concurring).
[58] *Id.*, slip op. at 11.
[59] 330 U.S. 1 (1947).

influence a person to go to *or remain away from church against his will*."[60] This principle is so basic and elementary to Establishment Clause jurisprudence that no public official has dared to try it – until 2020.

Defendants argue that their restrictions on church gatherings do not violate the *Lemon* test.[61] In so arguing, the Defendants fail to take into account that (1) forcing people to stay away from church has the principal effect of inhibiting religion and (2) regulating how churches may meet fosters excessive government entanglement with religion[62] – both of which are violations of the jurisdictional separation between Church and State. They also fail to take into account recent Supreme Court opinions that require the courts to focus more on history than on the *Lemon* test.[63] Forbidding people to stay away from church is unprecedented in our nation's history. But regardless of whether *Lemon* applies or not, the more fundamental point is this: *Everson* said that the Establishment Clause prevents the government from forcing people to stay away from church, which is exactly what is happening here.

> d.    Freedom of Assembly

In modern times, the courts have swallowed up freedom of assembly with freedom of speech.[64] Although related to free speech, it was listed in the Constitution as a distinct right.

---

[60] *Id.* at 15 (emphasis added).
[61] *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (holding that in order to survive an Establishment Clause challenge, the government's action must (1) have a secular purpose, (2) neither advance *nor inhibit* religion as its primary effect, and (3) must not foster an excessive government entanglement with religion).
[62] *Lemon*, 403 U.S. at 612-13.
[63] *See Town of Greece v. Galloway*, 134 S.Ct. 1811, 1819 (2014) ("Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change."); *American Legion v. American Humanist Ass'n*, 139 S.Ct. 2067, 2080 (2019) (plurality opinion) (severely impeaching *Lemon*).
[64] David Bernstein, *Freedom of Assembly and Petition*, in *The Heritage Guide to the Constitution* 316 (1st ed. 2005).

Thus, Defendants' attempts to use free-speech cases to analyze the freedom of assembly claim are inapposite. As Judge Willet noted, the Greek word for "church" in the New Testament literally means "assembly," meaning that the Church is, by its very definition, an assembly.[65] Thus, regardless of whether the government may issue valid time, place, and manner restrictions like it can with freedom of speech, it cannot issue regulations that are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."[66] If the government issues regulations that forbid a group of people that are by definition an assembly from assembling, then it has issued orders that are a plain, palpable invasion of the right to peaceably assemble.

e.    Freedom of Speech

By forbidding Pastor Spell and his church from assembling as usual on Sundays, the Defendants are forbidding the pastor from speaking to his congregation and his congregation from speaking to him. The government is therefore not only abridging their freedom of speech, but also the right of the Church to exercise a jurisdiction separate from that of the State. Defendants attempt to evade this argument by claiming that Plaintiffs' speech is more akin to expressive conduct like burning a draft card than actual speech and should therefore be subject to the more lenient standard of *United States v. O'Brien*.[67] Anyone who has been to church knows that people actually speak to each other while they are there; therefore, Defendants' argument is due to be rejected. Moreover, even if the Defendants' restrictions of Plaintiffs' speech could be justified as valid time, place, and manner restrictions under other circumstances, the unequal

---

[65] *First Pentecostal Church of Holly Springs v. City of Holly Springs*, No. 20-60399, slip op. at 3 n.1 (5th Cir. May 22, 2020) (Willet, J., concurring).
[66] *Jacobson*, 197 U.S. at 31.
[67] 391 U.S. 367 (1968).

treatment of Plaintiffs with the Black Lives Matter protestors reveals that the restrictions against Plaintiffs are a pretext for viewpoint discrimination.[68]

f.    Equal Protection

Equal Protection Clause prohibits a state from denying to any person within its jurisdiction the equal protection of the laws.[69] As an original matter, it appears from the text of the Amendment simply prohibits the government from granting the law's protection to some people but not others. Thus, without even getting into the different tiers of judicial scrutiny, it should be sufficient to say that if Defendants grant constitutional protection to the protestors but not to Plaintiffs, then an equal protection violation has taken place. Plaintiffs have certainly met the burden of pleading that such a case exists here.

When COVID-19 hit, many churches pursued alternate methods of assembling that were acceptable according to their convictions, such as live-streaming or conducting drive-in services. But nothing in the First Amendment gives the state any right to interfere with how or in what manner a church performs a worship service. Governor Edwards' proclamations target Plaintiffs by forbidding them from meeting in person according to the dictates of their faith.

3.  *The Eleventh Amendment does not bar Plaintiffs' state-law claim.*

The Governor next argues that Plaintiffs' state-law claim are barred by *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). In that case, the Supreme Court held that Eleventh Amendment forbids a federal court to enjoin a state official from breaking state law. This holding was based on the long-held view that the Eleventh Amendment protects the right of a state not to be sued by its own citizens. The Eleventh Amendment, which was passed in

---

[68] *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992) (holding that an ordinance "in practical operation" went beyond its four corners into "actual viewpoint discrimination").
[69] U.S. Const., amend XIV, § 1.

response to *Chisolm v. Georgia*, 2 Dall. 419 (U.S. 1793), says, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." In this case, the Eleventh Amendment cannot be construed to prevent a federal court from stopping Governor Edwards from violating the rights of the Citizens of Louisiana under the US Constitution.

This Court must take care to recognize the difference in the Amended Complaint between Counts V through VII, which ask this Court to enforce state law, and Count VIII, which this Court must examine to determine whether a violation of federal law has taken place. Defendants' defense relies heavily on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which the Fifth Circuit interpreted in *Abbott* to mean that "'[u]nder the pressure of great dangers,' constitutional rights may be reasonably restricted 'as the safety of the general public may demand.'"  In *Jacobson*, the Supreme Court deferred to state authority under its police power when no clear violation of Constitutional rights occurred.

In this case, Louisiana is unique among the states in that it has expressly waived the right to deference in emergency situations. La. Rev. Stat. 29:736(D) explicitly prohibits the Governor's emergency powers from trespassing on constitutional rights. If Jacobson instructed the federal courts to respect the states' prerogative to deal with emergencies, then it should realize that applying that principle here means not deferring to the Governor. The Supreme Court offered the States the gift of deference in Jacobson, but the people of Louisiana said, "No thanks; keep us honest instead," in La. Rev. Stat. 29:736(D). Thus, in this case, because La. Rev. Stat. 29:736(D) must be examined to determine whether a violation of federal law took place, Pennhurst does not preclude Plaintiffs' claim under that statute.

**B.      Sheriff Gautreaux's Claims**

  *1.      Failure to State Claim in Official Capacity*

Sheriff Gautreaux argues that the claim against him in his official capacity is really one against the parish. He further argues that he is not liable in this capacity because Plaintiffs cannot prove that the parish had an unconstitutional custom or policy, since (he claims) there is no pattern that can prove such a policy existed. As the chief law enforcement officer of the parish, Sheriff Gautreaux has the authority to make the policy as to whether to arrest people for violating the Governor's orders or not. While at this time Sheriff Gautreaux has threatened to arrest Pastor Spell only once, Plaintiffs sued him in his official capacity (1) to enjoin him from creating a policy that would lead to Pastor Spell's arrest and (2) to hold him accountable if he acted on that policy. Plaintiffs are still seeking an injunction because the prosecutions against Pastor Spell have only increased since this litigation commenced.

  *2.      Failure to State Claim in Individual Capacity*

Sheriff Gautreaux next argues that Plaintiffs have failed to state a claim against him in his individual capacity, arguing like Governor Edwards that he was entitled to qualified immunity. Plaintiffs hereby incorporate the same arguments as stated in Part III.B.2 *supra* against Sheriff Gautreaux, arguing that this is an obvious-clarity case for the same reasons.[70] Sheriff Gautreaux also claims that qualified immunity protects a law enforcement officer who makes an arrest under a statute until it is declared unconstitutional. As a threshold matter, that rule is inapplicable in this case because there is no *statute*. As Plaintiffs have been arguing all along, Governor

---

[70] The only authorization Sheriff Gautreaux had for threatening to arrest Pastor Spell was Governor Edwards's orders. Thus, if those orders are plainly unconstitutional (so that not even Governor Edwards would be entitled to qualified immunity) and if Sheriff Gautreaux threatens to arrest Pastor Spell based on those orders, then Sheriff Gautreaux would not be entitled to qualified immunity either.

Edwards' orders are not law, both because the Governor does not have legislative power and because Louisiana law specifies that the Governor may not violate constitutional rights during emergencies. In addition, Sheriff Gautreaux overlooks relevant Supreme Court precedent holding that that case law is not necessary in cases of obvious clarity,[71] such as this one.

## C.    Chief Corcoran's Claims

### 1.    Individual Capacity Claims

Chief Corcoran argues that Plaintiffs fail to state a claim against him in his individual capacity because he was attempting in good faith to enforce the Governor's orders. In support, Chief Corcoran cites La. Rev. Stat. 33:423, which provides that the chief of police "shall have general responsibility for law enforcement in the municipality, and shall be charged with the enforcement of all *ordinances* within the municipality and all *applicable state laws*." (Emphasis added.) Plaintiffs again point out that Governor Edwards' orders are not law, and if there were any need for clarification, La. Rev. Stat. 29:736(D) clarifies that the Governor does not have the authority to abridge constitutional rights during a crisis. Thus, La. Rev. Stat. 33:423 would not insulate Chief Corcoran for enforcing an unconstitutional order.

### 2.    Official Capacity Claims

Finally, Chief Corcoran argues that qualified immunity protects him from claims alleged against him in his official capacity. As a threshold matter, because official capacity claims are another way of asserting a claim against the municipality rather than the individual,[72] it seems that the qualified immunity defense would be relevant to the individual-capacity claims instead

---

[71] *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).
[72] *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978).

of the official-capacity claims. Regardless, for the reasons stated *supra* at Part III.B.2, Chief Corcoran is not entitled to qualified immunity because this is a case of obvious clarity.

Moreover, as Sheriff Gautreaux argued, the chief law enforcement officer in a particular jurisdiction can be held liable in his official capacity if the Plaintiffs can establish a municipal custom or policy that deprived them of their constitutional rights.[73] Plaintiffs can establish the existence of such policy or custom if "no rule has been announced as 'policy' but federal law has been violated by an act of the policymaker itself."[74] As the chief law enforcement officer in his city, Chief Corcoran decided to issue the misdemeanor summonses upon Pastor Spell based on Governor Edwards's unconstitutional orders. Chief Corcoran's actions therefore violated federal law by an act of the policymaker himself. Chief Corcoran is therefore not immune from being sued in his official capacity.

It is also worth noting that Chief Corcoran arrested Pastor Spell for allegedly attempting to back a bus into a protestor after he issued the misdemeanor summonses to him. He also threatened to arrest Pastor Spell if he left his home. These issues need to be explored during discovery to determine whether they were issued as part of a pattern of depriving Pastor Spell of his constitutional rights. But at this stage, Plaintiffs have alleged enough to survive a motion to dismiss on this count.

---

[73] Doc. 117-1, Gautreaux Mem. at 7.
[74] *Id.*; *accord Coggin v. Longview Indep. Sch. Dist.*, 289 F.3d 326, 333 n. 27 (5th Cir. 2002).

## CONCLUSION

Defendants' motions to dismiss are due to be denied.

Respectfully submitted this 8th day of September 2020.

/s/ Roy S. Moore                        /s/Jeffrey S. Wittenbrink
Roy S. Moore, ABA #6532R53R             Jeffrey S. Wittenbrink, LSBA # 18511
*Attorney for Plaintiffs*               *Local Counsel, Attorney for Plaintiffs*
FOUNDATION FOR MORAL LAW                *with Foundation for Moral Law*
1 Dexter Ave.                           524 Baird Drive
Montgomery, Alabama 36104               Baton Rouge, Louisiana 70808
334-262-1245                            225-308-6850
kayla@morallaw.org                      jwittenbrink@thelawyerbr.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2021, I filed the foregoing through the Court's electronic filing system, which will serve a copy on counsel of record for all parties.

/s/Jeffrey S. Wittenbrink
 Jeffrey S. Wittenbrink, LSBA # 18511
*Local Counsel, Attorney for Plaintiffs*
 *with Foundation for Moral Law*
331 St, Ferdinand Street
Baton Rouge, Louisiana 70802
225-308-6850
jwittenbrink@thelawyerbr.com