## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

MARK ANTHONY SPELL, ET AL.                                      CIVIL ACTION

VERSUS

JOHN BEL EDWARDS, ET AL.                              NO. 20-00282-BAJ-EWD
                                                 *C/W* NO. 21-00423-BAJ-EWD

### RULING AND ORDER

As detailed in the Court's prior orders, these consolidated actions challenge Louisiana's statewide crowd-size limits on indoor gatherings implemented in response to the COVID-19 pandemic, on the basis that such limits restrict Plaintiffs' First Amendment right to religious assembly. On November 10, 2020 the Court dismissed Civil Action No. 20-00282 (the lead case), determining that Plaintiffs failed to establish a constitutional violation because the Constitution permits reasonable restrictions on fundamental rights during public health emergencies—including rights guaranteed by the First Amendment's Free Exercise Clause—and because Louisiana's crowd-limits on indoor gatherings were reasonably related to suppressing the deadly COVID-19 virus. (Doc. 95).

On July 6, 2021, the U.S. Court of Appeals for the Fifth Circuit vacated this Court's November 10 dismissal order, and remanded with instructions to reconsider Plaintiffs' First Amendment Free Exercise Clause claim in light of new guidance from the U.S. Supreme Court, specifically, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (hereinafter, "*South Bay II*"), and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021).

(Doc. 112).

Now, with the benefit of the Supreme Court's guidance, the Court reaches the same result as before: Plaintiffs' consolidated actions will, again, be dismissed. In short, the Supreme Court's most recent jurisprudence cannot save Plaintiffs' claims for injunctive relief because the challenged restrictions have expired on their own terms and there is no indication whatsoever that crowd-size limits on indoor assembly will be reinstated. Thus, an injunction is a moot point. Further, Plaintiffs' demand for damages fails because there is not now, and never has been, a "clearly established" right to unrestricted religious assembly, and at all relevant times Defendants reasonably believed that they were acting within the constitutional limits set by the Supreme Court and the Fifth Circuit. Thus, Defendants are shielded from liability by qualified immunity.

## I.    RELEVANT BACKGROUND

The Fifth Circuit's July 6 remand order directs the Court to reconsider Plaintiffs' Free Exercise Clause claim in light of "the Supreme Court's recent cases regarding how the Free Exercise Clause applies in the particular context of state-imposed COVID-19 restrictions on religious worship." (Doc. 112 at 5). Although the Court's prior orders have already recounted much of the factual background that produced the instant dispute, for ease of reference the Court highlights the following facts in fulfillment of its mandate from the Circuit.

### A. Louisiana implements countermeasures to combat the spread of COVID-19, including statewide crowd-size limits on indoor gatherings

On March 11, 2020, Louisiana Governor John Bel Edwards issued an

2

Executive Proclamation declaring a statewide public health emergency in response to the rapid spread of the novel coronavirus SARS-CoV-2, *aka* COVID-19.  *See* La. Exec. Dep't, Proclamation No. 25 JBE 2020 (Mar. 11, 2020).[1] Thereafter, this original Proclamation begat a series of unprecedented restrictions on civil liberties as state officials, guided by federal and state public health authorities (including the Centers for Disease Control and Prevention and the Louisiana Department of Health), devised and implemented public health countermeasures to reduce transmission of COVID-19 and combat the imminent and deadly threat of the global pandemic.

Beginning March 13, 2020, such countermeasures included crowd-size limits on indoor gatherings. Specifically, the Governor's March 13 Proclamation limited all "gatherings in a single space at the same time where individuals will be in close proximity to one another" to no more than 250 people.  *Id.*, Proclamation No. 27 JBE 2020 § 1 (Mar. 13, 2020). Thereafter, on March 16, the Governor reduced the permissible gathering size to no more than 50 people.  *Id.*, Proclamation No. 30 JBE 2020 § 1 (Mar. 16, 2020).  These initial crowd-size limits expressly exempted "normal operations at locations like airports, medical facilities, shopping centers or malls, office buildings, factories or manufacturing facilities, or grocery or department stores." *Id.* The March 16 Proclamation did, however, *close* all casinos, video poker establishments, movie theaters, bars, and fitness centers and gyms, and prohibited on-site consumption of food and beverages at restaurants.  *Id*, Proclamation No. 30

---

[1]  The Governor's various Proclamations referenced herein are available at https://gov.louisiana.gov/index.cfm/newsroom/category/23 (last visited January 12, 2022).

JBE 2020 §§ 2-3.

The Governor's crowd-size limits on indoor gatherings were most restrictive from March 22 to May 15, 2020, reflecting heightened concerns regarding the rate at which COVID-19 was spreading throughout Louisiana, and corresponding concerns that the State's health care facilities would be quickly overwhelmed by seriously ill COVID-19 patients. During this eight week period, the Governor imposed a series of statewide "stay-at-home" orders, directing all individuals to "stay home unless performing an essential activity." *Id.*, Proclamation Nos. 33 JBE 2020 § 3 (Mar. 22, 2020); 41 JBE 2020 (Apr. 2, 2020); 52 JBE 2020 (Apr. 30, 2020) (collectively, the "Stay-at-Home Orders"). Notably, the Governor's Stay-at-Home Orders expressly defined "[g]oing to and from an individual's place of worship" as an "essential activity," *id.* § 3(E), yet also prohibited indoor gatherings of groups exceeding 10 people, *id.* § 2. The Stay-at-Home Orders also *closed* various "nonessential businesses," including "[a]ll places of public amusement, whether indoors or outdoors," "[a]ll personal care and grooming businesses," and "[a]ll malls, except for stores in a mall that have a direct outdoor entrance and exit that provide essential services and products." *Id.* § 4. Still, however, the Stay-at-Home Orders exempted airports, hospitals, office buildings, manufacturing facilities, and grocery stores from the 10-person crowd limit.

Beginning May 16, 2020, as the first wave of COVID-19 cases receded, the Governor moved Louisiana into Phase 1 of "re-opening." *See id.*, Proclamation No. 58 JBE 2020 (May 14, 2020) (the "Phase 1 Order"). The Phase 1 Order marked a turning

point in the Governor's response to the pandemic by implementing a gradual re-opening of businesses and lifting the State's most severe restrictions on indoor gatherings. Relevant here, churches and other faith-based organizations were allowed to resume operations at "25% of the total occupancy as determined by the State Fire Marshal, counting both the number of employees and members of the public present in the building at one time." *Id.* § 2(G). Further, churches and other faith-based organizations were expressly permitted to continue holding outdoor services *without* size limits, provided that they adhered to social distancing measures set forth in the State Fire Marshal's May 1, 2020 Interpretive Memorandum. *Id.* § 2(G)(4)(b); *see also* Interpretive Mem. 2020-24, Office of State Fire Marshall (May 1, 2020), http://sfm.dps.louisiana.gov/doc/interpmemos/im_2020-24.pdf. By contrast, all indoor *and* outdoor public amusement venues remained closed. *Id.* § 2(E).

On June 4, 2020, the Governor moved the State into Phase 2 of re-opening. *See* La. Exec. Dep't, Proclamation No. 74 JBE 2020 (June 4, 2020) (the "Phase 2 Order"). Again, the Phase 2 Order eased crowd-size limits on churches and faith-based organizations, allowing religious assemblies to operate indoors at 50% of total occupancy, and to operate outdoors without limitation. *See id.* § 2(G)(4). Still, all indoor *and* outdoor public amusement venues remained closed. *Id.* § 2(E). The Governor ultimately extended the Phase 2 Order four times, until September 10, 2020. *See id.*, Proclamation Nos. 83 JBE 2020 (June 25, 2020), 96 JBE 2020 (July 23, 2020), 101 JBE 2020 (Aug. 6, 2020), 110 JBE 2020 (Aug. 26, 2020).

Due to a second surge of COVID-19 case numbers in the summer of 2020, on

July 11 the Governor issued additional Phase 2 mitigation measures to address the "increased risk of infection at large gatherings . . . where strict social distancing is unable to occur." *Id.*, Proclamation No. 89 JBE 2020 (July 11, 2020). This July 11 Proclamation reinstated prohibitions against on-premises consumption of food or drink at bars, and imposed a 50-person limit on indoor and outdoor *secular* gatherings, but *expressly exempted* churches and other faith-based organizations from such limits. *Id.* §§ 2-3.

On September 11, 2020 the Governor moved the State into Phase 3 of re-opening. *See id.*, Proclamation Nos. 117 JBE 2020 (Sept. 11, 2020); 123 JBE 2020 (Sept. 17, 2020), 134 JBE 2020 (Oct. 8, 2020), 143 JBE 2020 (Oct. 22, 2020), 158 JBE 2020 (Nov. 5, 2020) (collectively, the "Phase 3 Order"). The Phase 3 Order permitted churches and faith-based organizations to operate indoors at 75% of total capacity, and to continue outdoor operations unabated. *Id.* § 2(D)(4). Sports venues were permitted, for the first time, to host events at 25% capacity, and event centers and reception halls were allowed to operate at the lesser of 50% of total occupancy or 250 people. *Id.* § 2(D)(7), (8). Other places of public amusement, including concert and music halls, remained closed. *Id.* § 2(B)(1).

Beginning in early November 2020, Louisiana experienced a third surge of COVID-19 cases. As a result, the Governor returned Louisiana to a modified Phase 2, reducing the crowd-size limit on most businesses, including restaurants, shopping malls, and gyms, from 75% to 50% of total capacity. *See id.*, Proclamation No. 168 JBE 2020 § 2(D) (Nov. 24, 2020) (the "Modified Phase 2 Order"). The Governor's

Modified Phase 2 Order *did not* reduce the crowd-size limit for churches or other faith-based organizations, which were allowed to continue operating indoors at 75% of capacity, and outdoors without limitation. *See id.*, § 2(D)(4).

Louisiana remained under these modified Phase 2 restrictions until the Governor returned the State to Phase 3 on March 2, 2021. *See id.*, Proclamation Nos. 209 JBE 2020 (Dec. 22, 2020), 6 JBE 2021 (Jan. 12, 2021), 29 JBE 2021 (Mar. 2, 2021). Notably, the March 2, 2021 Phase 3 Order removed *all* indoor capacity limits on religious assemblies. *See id.*, § 2(D). At the same time, however, the March 2 proclamation required "face covering[s] over the nose and mouth when inside … any other building or space open to the public, whether indoor or outdoor." *See id.*, § 3(A). Religious organizations were *not* exempted from this statewide mask mandate. *See id.*, § 3(B).

Since March 2, 2021 the Governor's proclamations have imposed *no* crowd-size limits on religious assemblies, *despite* Louisiana having experienced a deadly fourth wave of COVID-19 cases in summer 2021 (driven by the more contagious Delta variant), *and* having experienced a rapidly surging fifth wave of COVID-19 cases in December 2021 and January 2022 (driven by the even more contagious Omicron variant). *See id.*, Proclamation Nos. 66 JBE 2021 (Mar. 30, 2021), 79 JBE 2021 (Apr. 27, 2021), 85 JBE 2021 (May 14, 2021), 93 JBE 2021 (May 25, 2021), 117 JBE 2021 (June 22, 2021), 131 JBE 2021 (July 21, 2021). Notably, hospitalizations for COVID-19 during the Delta and Omicron surges far *exceeded* those which prompted the Governor's early restrictions on indoor assembly.

The statewide mask mandate expired on April 27, 2021, with limited exceptions for schools, prisons, and public transportation facilities. *See id.*, Proclamation Nos. 66 JBE 2021 (Mar. 30, 2021).

### B. Plaintiffs hold indoor worship services in violation of Louisiana's crowd-size limits on indoor gatherings and are cited with misdemeanor summonses

Life Tabernacle Church, headed by Pastor Spell, is an evangelical Christian congregation that hosts weekly worship services attended by more than 2,000 members. (Doc. 58 at ¶ 25). Pastor Spell and Life Tabernacle Church believe that the Bible unequivocally commands them to worship in person, and therefore have continued weekly indoor services unabated throughout the COVID-19 pandemic, notwithstanding Louisiana's COVID-19 limits on indoor gatherings. (Doc. 58 at ¶¶ 26-30). Early in the pandemic—*i.e.*, when the Governor's crowd-size limits were most restrictive—Plaintiffs' resistance drew considerable attention, and ultimately resulted in Pastor Spell being issued six misdemeanor summonses by the Central, Louisiana Police Department, under the supervision of Chief of Police Roger Corcoran. (*See id.* at ¶¶ 38-40). These misdemeanor summonses alleged six separate violations of Louisiana's crowd-size limits on indoor gatherings, each occurring between March 17 and March 29, 2020 (*id.* at ¶ 38), when the Governor transitioned the State from a 50-person limit on indoor gatherings to the 10-person limit set forth in the Stay-at-Home Orders. *See* Proclamation Nos. 30 JBE 2020; Proclamation No. 33 JBE 2020. Allegedly, Plaintiffs' resistance also prompted East Baton Rouge Parish Sheriff Sid Gautreaux to threaten Pastor Spell with arrest if he continued holding church services. (*Id.* at ¶ 32).

### C. This Court rejects Plaintiffs' original challenge to Louisiana's indoor crowd-size limits, determining that they are reasonably aimed to stop the spread of COVID-19

On May 7, 2020, Plaintiffs filed their original Complaint in this Court, naming various Defendants in their official and individual capacities, including Governor Edwards, Chief Corcoran, and Sheriff Gautreaux.[2] (Doc. 1). At its core, Plaintiffs' Complaint alleged that the Governor's indoor crowd-size limits implemented in response to COVID-19 violated their First Amendment rights to freely assemble and to worship in the manner required by their evangelical faith. (Doc. 1 at ¶¶ 43-73).[3] Relevant here, Plaintiffs sought immediate (and permanent) injunctive relief prohibiting Defendants from enforcing the Governor's indoor crowd-size limits, and unspecified "compensatory, nominal, punitive, and other damages." (*Id.* at p. 30).

On May 14, 2020, the Court held a hearing to determine whether Plaintiffs were entitled to a temporary restraining order prohibiting enforcement of the Governor's crowd-size limits. (Doc. 60). At the conclusion of the hearing, the Court denied injunctive relief against Chief Corcoran and Sheriff Gautreaux, but took Plaintiffs' request as to Governor Edwards under advisement. (*Id.*).

---

[2] Plaintiffs' original Complaint also named Central, Louisiana Mayor David Barrow, Baton Rouge Mayor Sharon Weston Broome, and Louisiana Nineteenth Judicial District Court Judge Fred Crifasi as Defendants. (Doc. 1 at ¶¶ 6, 8, 10). Plaintiffs voluntarily dismissed these Defendants on May 12, 2020. (Docs. 23, 24).

[3] Plaintiffs further alleged that the Governor's Proclamations violated their First Amendment right to free speech by "restrict[ing] Pastor Spell from speaking to his congregation and the members of his congregation from speaking to him," and violated their Fourteenth Amendment right to equal protection by "treat[ing] Plaintiffs differently from other similarly situated businesses and non-religious entities on the basis of the content and viewpoint of the gatherings that Pastor Spell and Life Tabernacle Church hold." (Doc. 1 at ¶¶ 76, 83). Plaintiffs' Complaint also sets forth various state law claims, essentially mirroring the federal claims outlined above. (*Id.* at ¶¶ 85-113).

Thereafter, on May 15, the Court entered its written Order denying Plaintiffs' request as to Governor Edwards as well, determining that Plaintiffs were unlikely to prevail in their constitutional claims because constitutional rights are *not* unlimited and may be reasonably restricted by the State in response to public health emergencies, and because the crowd-size limits at issue were reasonably aimed to stop the spread of COVID-19. (Doc. 46 at pp. 5-13). In reaching this conclusion, the Court was guided by the U.S. Supreme Court's decision in *Jacobson v. Massachusetts*, which rejected a challenge to Massachusetts' compulsory smallpox vaccination law and stated (without qualification) that "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community." 197 U.S. 11, 26 (1905) (quoting *Crowley v. Christensen*, 137 U.S. 86, 89 (1890); *see also Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.").

Even more to the point, the Court's analysis of Plaintiffs' action was instructed by the Fifth Circuit's freshly-minted (April 7, 2020) decision in *In re Abbott*, where the Circuit rejected a constitutional challenge to Texas's COVID-19 restrictions on "non-essential surgeries and procedures" (including abortions), and expressly affirmed that "*all* constitutional rights may be reasonably restricted to combat a public health emergency," including "one's right to peaceably assemble, [and] to publicly worship." *In re Abbott*, 954 F.3d 772, 786-88 (5th Cir. 2020). The Fifth

10

Circuit's reasoning in *Abbot* left no doubt that the merits of Plaintiffs' Free Exercise Clause claim must be judged against a "reasonableness" standard—indeed, the Circuit said so explicitly, stating: "*Jacobson* governs a state's emergency restriction of *any* individual right, not only the right to abortion. The same analysis would apply, for example, to an emergency restriction on gathering in large groups for public worship during an epidemic." *Id.* at 778 n.1 (citing *Prince*, 321 U.S. at 166–67). To drive the point home, the Circuit outlined the test for determining the constitutionality of restrictions on fundamental rights during public health emergencies as follows:

> The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." [*Jacobson*, 197 U.S. at 31]. Courts may ask whether the state's emergency measures lack basic exceptions for 'extreme cases,' and whether the measures are pretextual—that is, arbitrary or oppressive. *Id.* at 38. At the same time, however, courts may not second-guess the wisdom or efficacy of the measures. *Id.* at 28, 30.

> *Jacobson* remains good law.

*In re Abbott*, 954 F.3d at 784–85.

Plaintiffs did not immediately appeal this Court's May 15 order. Instead, on May 29, 2020 Plaintiffs filed their First Amended And Supplemental Complaint, which amplified and supplemented allegations set forth in their original Complaint. (Doc. 58). Plaintiffs' Amended Complaint also added state law claims for wrongful imprisonment and defamation against Chief Corcoran, each related to Chief Corcoran's enforcement of the Governor's crowd-size limits and statements to the

media regarding the same. (*See* Doc. 58 at ¶¶ 152-53).

On June 5, 2020, Plaintiffs finally appealed this Court's May 15 order, and sought a TRO from the Fifth Circuit. The Fifth Circuit promptly rejected Plaintiffs' gambit, and likewise determined that Plaintiffs' request for injunctive relief was meritless, but for a different reason: An injunction would be meaningless—and, therefore, Plaintiffs' request was moot—because the Governor's most restrictive crowd-size limits had already expired. *Spell v. Edwards*, 962 F.3d 175, 179–80 (5th Cir. 2020) (hereinafter, "*Spell I*"). Relevant here, the Circuit explained that because the challenged crowd-size limits expired naturally, Defendants' actions were *not* susceptible to concerns that they ceased their "unlawful conduct" merely to avoid accountability. *Id.* at 179. Further, the Circuit held that Plaintiffs could *not* establish the "capable of repetition, but evading review" exception to the mootness doctrine because there was no indication "that the Governor might reimpose another gathering restriction on places of worship." *Id.* at 180. Rather, the Circuit observed that "[t]he trend in Louisiana has been to reopen the state, not to close it down. To be sure, no one knows what the future of COVID-19 holds. But it is speculative, at best, that the Governor might reimpose the ten-person restriction or a similar one." *Id.* Having rejected Plaintiffs' claims to injunctive relief, the Circuit remanded Plaintiffs' case to this Court for adjudication of Plaintiffs' claims for damages. *Id.*

Upon return to this Court, Governor Edwards, Chief Corcoran, and Sheriff Gautreaux sought dismissal of Plaintiffs' Amended Complaint. In sum, Defendants argued that Plaintiffs' allegations were too conclusory to state any actionable

constitutional claim; that, in any event, the Governor's crowd-size limits (and Defendants' efforts to enforce them) passed constitutional muster; and, finally, that even if Plaintiffs' constitutional claims were actionable, Defendants were shielded from individual liability by the qualified immunity doctrine because each Defendant acted in good faith based on a reasonable belief that existing constitutional law permitted crowd-size limits aimed to slow the spread of a highly-transmissible virus. (Docs. 74, 78, 80). In support of their qualified immunity defense, Defendants observed that in *Abbot*—issued just *one* month before Plaintiffs filed suit—the Fifth Circuit unequivocally instructed that "*all* constitutional rights may be reasonably restricted to combat a public health emergency." *In re Abbott*, 954 F.3d at 786.

On November 10, 2020, this Court issued its first order dismissing Plaintiffs' action on the merits. (Doc. 95). Consistent with the reasoning set forth in the Court's May 15 order denying Plaintiffs' request for a TRO, the Court's November 10 order explained that Plaintiffs' claims failed because the Constitution permits reasonable restrictions on indoor religious gatherings when such limits are aimed to address a public health emergency, and the Governor's crowd-size limits were reasonably targeted to reduce transmission of COVID-19. (*Id.*). Notably, in addition to the authorities cited above, the Court's November 10 dismissal order was guided by Chief Justice Roberts' May 29, 2020 concurrence in *South Bay I*, where the Supreme Court *denied* injunctive relief to a group of California plaintiffs challenging virtually identical COVID-19 crowd-limits imposed by California's Governor. In relevant part, the Chief Justice explained:

Although California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause of the First Amendment. Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).

That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground. The notion that it is "indisputably clear" that the Government's limitations are unconstitutional seems quite improbable.

*South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (hereinafter "*South Bay I*").

Having determined that Plaintiffs' constitutional claims failed, this Court dismissed Plaintiffs action with prejudice, without addressing whether Defendants' individual acts were shielded by qualified immunity.

14

### D. Plaintiffs' challenge is resuscitated by the Fifth Circuit in response to intervening Supreme Court guidance

Plaintiffs appealed the dismissal of their original action. As their appeal was pending, the U.S. Supreme Court issued temporary injunctive relief in three separate religious liberty cases challenging similar crowd-size limits in New York and California. Collectively, these three decisions called into question the basis of this Court's November 10 dismissal order.

First, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court enjoined New York's Governor from enforcing 10- and 25-person indoor occupancy limits against religious congregations in New York City. Relevant here, the Court held that such occupancy limits were not "neutral" and of "general applicability" because they exempted "essential" businesses, and that therefore any such restrictions "must satisfy 'strict scrutiny,'" meaning "that they must be 'narrowly tailored' to serve a 'compelling' state interest." 141 S. Ct. at 67 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). The Court further determined that while "[s]temming the spread of COVID–19 is unquestionably a compelling interest," the plaintiff congregations were likely to succeed on the merits of their challenge because New York's occupancy limits were "more severe than has been shown to be required to prevent the spread of the virus at the applicants' services," and because "less restrictive rules … could be adopted to minimize the risk to those attending religious services," including "maximum attendance … [limits] tied to the size of the church or synagogue." *Id.*

Second, on February 5, 2021, the Supreme Court issued its decision in *South*

*Bay II*, the sequel to the Court's May 29, 2020 *South Bay I* decision recounted above. This time, in a brief (one-paragraph) opinion, the Court enjoined California's Governor from enforcing California's ban on *all* indoor worship services. Notably, however, the Court *denied* injunctive relief "with respect to … percentage capacity limitations" on religious services, specifically stating that the Governor was "not enjoined from imposing a 25% capacity limitation on indoor worship services." *South Bay II*, 141 S. Ct. at 716.

Third, on April 9, 2021, the Supreme Court issued its decision *Tandon v. Newsom*, which prohibited California's Governor from enforcing California's ban on at-home religious gatherings of more than three households. Here, the Supreme Court set forth a more precise blueprint for judicial review of Free Exercise Clause cases in the COVID-19 era:

> First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise. It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue.
>
> Second, whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. Comparability is concerned with the risks various activities pose, not the reasons why people gather.
>
> Third, the government has the burden to establish that the challenged law satisfies strict scrutiny. To do so in this context, it must do more than assert that certain risk factors are always present in worship, or always absent from the other secular activities the government may allow. Instead, narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID. Where the government permits other activities to proceed with precautions, it must

16

show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too.

Fourth, even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case. And so long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the applicants remain under a constant threat that government officials will use their power to reinstate the challenged restrictions.

*Tandon*, 141 S. Ct. at 1296-97 (quotation marks and citations omitted).

Applying these principles, the Supreme Court held that California's restriction on at-home religious gatherings was subject to strict scrutiny analysis because California allowed comparable secular activities to proceed without a three-household restriction, and because there was no evidence that such secular "activities pose a lesser risk of transmission than [plaintiffs'] proposed religious exercise at home." *Id.* at 1297. Further California could not prove that its restriction was narrowly tailored to achieve its compelling interest in suppressing COVID-19 because the State offered no explanation "why it could not safely permit at-home worshipers to gather in larger numbers while using precautions used in secular activities." *Id.* Finally, the Court explained that the *Tandon* plaintiffs' challenge was not moot because the Governor's restriction on home worship remained in place for at least one more week, and because California officials maintained a history of "moving the goalposts," suggesting that "heightened restrictions" could be reinstated at any time. *Id.* Thus, the *Tandon* plaintiffs were likely to prevail in their challenge, and injunctive relief would still serve its purpose of protecting the plaintiffs' constitutional rights. *Id.*

17

On July 6, 2021, three months after the Supreme Court's *Tandon* decision, the Fifth Circuit issued its Judgment and Mandate vacating this Court's November 10 dismissal order. (Doc. 112). The Circuit's accompanying opinion observed that at the time this Court dismissed Plaintiffs' action, it lacked "the benefit of considering the Supreme Court's recent cases regarding how the Free Exercise Clause applies in the particular context of state-imposed COVID-19 restrictions on religious worship." (*Id.* at 5). Accordingly, the Circuit remanded with instructions to re-examine Plaintiffs' Free Exercise Clause claim in light of *Roman Catholic Diocese of Brooklyn*, *South Bay II*, and *Tandon*. (*Id.* at 5-6). Notably, the Circuit expressly avoided stating an "opinion on the merits of this case or the immunity defenses raised by the defendants, which the district court should review in the first instance." (*Id.* at 5).

### E. Plaintiffs file a second lawsuit in state court as their appeal of their original lawsuit is pending

One final wrinkle complicates the procedural history of this case. On April 6, 2021—as their appeal of the November 10 dismissal order was still pending—Plaintiffs filed a *second* lawsuit asserting identical constitutional claims in Louisiana state court. (Civil Action No. 21-cv-00423, Doc. 1-2, *hereinafter*, the "state court action"). Apart from passing references to Governor Edwards's statewide mask-mandate and the Louisiana Legislature's intermittent attempts to override the Governor's pandemic response measures, there is no meaningful difference between Plaintiffs' state court action and their original federal action. On May 7, 2020, Defendants removed Plaintiffs' state court action to this District, where it was consolidated for all purposes with Plaintiffs' original action. (Civil Action No. 21-cv-

00423, Docs. 1, 15).

### F. Defendants renew their motions to dismiss, notwithstanding the Supreme Court's intervening decisions in *Roman Catholic Diocese of Brooklyn*, *South Bay II*, and *Tandon*

This nearly brings us up to speed. Now before the Court are renewed motions to dismiss submitted by Governor Edwards, Sheriff Gautreaux, and Chief Corcoran. Collectively, Defendants' Motions seek wholesale dismissal of both the original federal action and the new state court action. In chronological order of filing, these Motions are as follows:

- Chief Corcoran's **Motion To Dismiss Pursuant To Rule 12(b)(6) (Doc. 10)**, filed in the state court action, Civil Action No. 21-00423;

- Sheriff Gautreaux's **Motion to Dismiss (Doc. 11)**, filed in the state court action, Civil Action No. 21-00423;

- Sheriff Sid Gautreaux's **Second Motion To Dismiss Plaintiffs' First Amended And Supplemental Complaint (Doc. 117)**, filed in the original action, Civil Action No. 20-00282;

- Chief Corcoran's **Second Motion To Dismiss Pursuant To Rule 12(b)(6) (Doc. 118)**, filed in the original action, Civil Action No. 20-00282;

- Governor Edwards's **Motion To Dismiss Plaintiffs' First Amended And Supplemental Complaint On Remand From Fifth Circuit (Doc. 119)**, filed in the original action,  Civil Action No. 20-00282; and

- Governor Edwards's **Motion To Dismiss (Doc. 13)**, filed the state court action, Civil Action No. 21-00423.

The arguments raised in Defendants' respective Motions are essentially the same between the two consolidated actions.[4] Plaintiffs have submitted one omnibus

---

[4] For clarity the Court will refer to Defendants' respective Motions simply as "Governor Edwards's Motions," "Sheriff Gautreaux's Motions," and "Chief Corcoran's Motions." Unless specifically noted otherwise, all record citations herein will refer to the docket as it appears in the original federal action, Civil Action No. 20-00282.

response opposing Defendants' Motions. (Doc. 121). Governor Edwards and Sheriff Gautreaux have each filed reply memoranda in further support of their Motions. (Docs. 122, 123).

For reasons explained below, Defendants Motions—all six of them—will each be granted, and Plaintiffs' consolidated actions will, again, be dismissed with prejudice. In sum, even taking into consideration the Supreme Court's most recent guidance, Plaintiffs' claims for injunctive relief remain moot because there is no indication whatsoever that the Governor will reinstate restrictions limiting Plaintiffs' ability to gather for worship. Additionally Plaintiffs' claims for damages fail because constitutional law as it existed throughout the early months of the COVID-19 pandemic indicated that capacity restrictions on indoor gatherings were "consistent with the Free Exercise Clause of the First Amendment." *See South Bay I*, 140 S. Ct. at 1613; *see also In re Abbott*, 954 F.3d at 786 ("*all* constitutional rights may be reasonably restricted to combat a public health emergency"). Thus, it was *not* clearly established that the Governor's Proclamations ran afoul of the First Amendment when they were issued, and the Defendants' acts to enforce the same are shielded from liability by the qualified immunity doctrine.

## II.    DISCUSSION

### A. Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### B. Analysis

#### 1. The Court assumes that Plaintiffs have stated an actionable Free Exercise Clause claim

The Fifth Circuit remanded Plaintiffs' action to this Court to determine in the first instance whether the Governor's Proclamations (and Chief Corcoran's and Sheriff Gautreaux's actions to enforce them) violate the First Amendment's Free Exercise Clause by imposing crowd-size limits on worship services while at the same time expressly allowing airports, hospitals, office buildings, manufacturing facilities, and grocery stores to continue operations without such limits.

In light of the Supreme Court's guidance in *Roman Catholic Diocese of Brooklyn*, *South Bay II*, and *Tandon*, the Court will assume that Plaintiffs' allegations show that the challenged Proclamations treat religious assemblies less favorably than "comparable" secular assemblies, "and therefore trigger strict scrutiny under the Free Exercise Clause." *Tandon*, 141 S. Ct. at 1296. Further, the Court will assume that the challenged Proclamations fail the strict scrutiny analysis because, as in *Tandon*, less-restrictive COVID-19 precautions applicable to "comparable" secular assemblies—such as mandatory vaccination, social distancing, and facial coverings—would also suffice to reduce the risk of COVID-19 transmission at worship services. *See id.* at 1297. As such, the Court will assume that Plaintiffs have stated the basic elements of an actionable Free Exercise Clause claim.

That is not the end of the inquiry, however, because to survive dismissal Plaintiffs must still show that they are entitled to *relief*—whether in the form of an injunction *or* damages. Here, Plaintiffs' claims falter for reasons explained below.

### 2.    Plaintiffs' claims to injunctive relief are moot

The Court's November 10 dismissal order determined that Plaintiffs' claims to injunctive relief are moot because the challenged Proclamations have all expired on their own terms and there is no indication whatsoever that they will be reinstated. (Doc. 95 at 9-10).[5] The intervening months have validated this conclusion. As illustrated above, all restrictions on religious assembly were lifted as of March 2, 2021. Since then, Louisiana has endured a deadly fourth wave of COVID-19 driven by the more contagious Delta variant, and has recently entered into a fifth wave of COVID-19 driven by the even more contagious Omicron variant, yet no additional crowd-size limits have been imposed on religious assemblies. Rather, time and experience have reinforced that "[t]he trend in Louisiana has been to reopen the state, not to close it down," making it even more speculative now to suggest that Plaintiffs might endure similar restrictions in the future. *See Spell I*, 962 F.3d at 180. Accordingly, Plaintiffs claims to injunctive relief are moot and must be dismissed.

*Tandon* is the only intervening Supreme Court opinion to directly address the issue of mootness in the context of COVID-19 restrictions on religious assembly. As

---

[5] To recall, the Fifth Circuit reached the same conclusion five months *earlier*, in its original opinion rejecting Plaintiffs' request for a TRO. *See Spell I*, 962 F.3d at 179 ("[A] statute that expires by its own terms does not implicate [concerns of litigation posturing by the Defendants]. Why? Because its lapse was predetermined and thus not a response to litigation. So unlike a postsuit repeal that might not moot a case, a law's automatic expiration does.").

indicated above, *Tandon* instructs that "even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case. And so long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the applicants 'remain under a constant threat' that government officials will use their power to reinstate the challenged restrictions." *Tandon*, 141 S. Ct. at 1297. But even *Tandon* does not dictate a different result here. Why? Because the factual circumstances that caused the Supreme Court to issue injunctive relief in *Tandon* were dramatically different. First, in *Tandon*, the challenged restrictions remained in effect for at least one more week when the Supreme Court issued its injunction. *Tandon*, 141 S. Ct. at 1297. Here, *all* restrictions on Plaintiffs' ability to congregate expired on March 1, 2021, more than ten months ago. Second, and more important, the *Tandon* Court simply did not credit California's argument that similar restrictions would not be reinstated after their expiration, given California's "track record of 'moving the goalposts'" in its response to the pandemic. *See id.* Here, in stark contrast, since the Governor issued the Phase 1 Order on May 16, 2020—*twenty* months ago— Louisiana's unwavering trend has been to lift restrictions on religious assembly. Again, no one knows what the future of COVID-19 holds. But Louisiana's track record makes it speculative, at best, that the Governor might reimpose similar restrictions in the future. *See Spell I*, 962 F.3d at 180.

### 3.    Plaintiffs' claims to damages are defeated by the qualified immunity doctrine

Qualified immunity shields a government official from liability for civil

damages "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019). Its intended purpose is to strike a balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties" by making it possible for government officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). Put differently, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Fifth Circuit's two-pronged test for qualified immunity asks (1) "whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," and (2) "whether the right was 'clearly established.'" *Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2020). A court may analyze these prongs in either order, and resolve the case on a single prong. *Id.* at 190.

Relevant here, to  determine whether a constitutional or statutory right was "clearly established" at the time of the alleged violation, the Court looks for guidance from controlling Supreme Court and Fifth Circuit authority. *See McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002). "[I]n the absence of directly controlling

authority, a 'consensus of cases of persuasive authority' [from other Circuits] might, under some circumstances, be sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were lawful." *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 604 (1999)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

Importantly, "[a] right is 'clearly established' only if it 'is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Cunningham*, 983 F.3d at 191 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). The "right must be defined with specificity," not "at a high level of generality." *Emmons*, 139 S. Ct. at 503 (quotation marks omitted). The "salient question" is "'whether the state of the law at the time of the state action gave the state actors fair warning that their alleged treatment of the plaintiff was unconstitutional.'" *McClendon*, 305 F.3d at 329 (quoting *Roe v. Texas Dep't of Protective & Regul. Servs.*, 299 F.3d 395, 409 (5th Cir. 2002)); *see also Mullenix*, 577 U.S. at 12 ("The dispositive question is whether the violative nature of the *particular* conduct is clearly established." (quotation marks omitted)). The "clearly-established" prong imposes a "demanding standard" that "is difficult to satisfy." *Cunningham*, 983 F.3d at 191.

Applying this framework, the Court determines that each of the remaining Defendants are entitled to qualified immunity.

### a. Governor Edwards

In their omnibus Opposition, Plaintiffs specify the constitutional right they seek to vindicate as "the right for their entire congregation to meet in person in the

25

church building." (Doc. 121 at 12). For present purposes, the Court will assume that such a right exists and, further, that the Governor's indoor crowd-size limits violated that right.

Still, Plaintiffs' Free Exercise Clause claim fails because, even now, the "right for [Plaintiffs'] entire congregation to meet in person in the church building" is *not* "clearly established."[6] In fact, at all relevant times during the course of this litigation,

---

[6] Significantly, Plaintiffs fail to identify even one case from any jurisdiction that establishes an unrestricted constitutional "right for [Plaintiffs'] entire congregation to meet in person in the church building." (Doc. 121 at 12). Instead, they insist such a right flows directly from the First Amendment's text, which, in relevant part, states "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" (Doc. 121 at 14). Yet, the Supreme Court has long rejected such a literal interpretation of the First Amendment, and has long refused to place categorical limits on government authority, particularly in the context of public health emergencies. *See Jacobson*, 197 U.S. at 29 ("There is, of course, a sphere within which the individual may assert the supremacy of his own will, and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."); *Prince*, 321 U.S. at 166–67 ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *see also In re Abbott*, 954 F.3d at 778 ("*all* constitutional rights may be reasonably restricted to combat a public health emergency"). Indeed, as indicated above, even *Tandon* rejects the view that the First Amendment must at all times be afforded its literal meaning, insofar as *Tandon* requires only that occupancy limits on religious assemblies withstand strict scrutiny in order to pass constitutional muster. *See Tandon*, 141 S. Ct. at 1296.

On a related note, there is no basis whatsoever to Plaintiffs' argument that the First Amendment removes issues of religious liberty from the State's "jurisdiction" to regulate. (Doc. 121 at 1 ("The text, history, and leading precedents concerning the Religion Clauses of the First Amendment show that the civil government has no jurisdiction to tell a church whether it may meet or not."). Again, the Supreme Court has long dismissed such assertions, because to remove issues of religious liberty from the State's "dominion" "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." *Reynolds v. United States*, 98 U.S. 145, 153, 167 (1878) (affirming petitioner's conviction of bigamy and rejecting petitioner's defense that he "believed it to be his religious duty" to marry a second time).

controlling authorities indicated that crowd-limits on indoor religious gatherings *are* constitutional, provided they satisfy the correct standard of constitutional review.

Early in the COVID-19 pandemic, when the Governor imposed his *most restrictive* crowd-limits, controlling authorities instructed that such limits *were* constitutional as long as they satisfied a "reasonableness" analysis. Specifically, on May 29, 2020, one week *after* the Governor issued his first Stay-at-Home Order limiting indoor gatherings to 10 people, the Supreme Court decided *South Bay I*, which *declined* to enjoin virtually identical restrictions imposed by California's Governor. Notably for present purposes, Chief Justice Roberts' *South Bay I* concurrence expressly *rejected* "[t]he notion that it is 'indisputably clear' that the Government's limitations are unconstitutional"—calling the idea "quite improbable." *South Bay I*, 140 S. Ct. 1614. Moreover, as indicated above, the Chief Justice's concurrence tacitly endorsed the reasonableness review of emergency public health restrictions originally set forth more than 100 years ago in *Jacobson*, stating:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).

*Id.* at 1613–14.

One week later, in *Abbot*, the Fifth Circuit drove the point home, stating

expressly that "*all* constitutional rights may be reasonably restricted to combat a public health emergency," including "one's right to peaceably assemble, [and] to publicly worship," and, further, that "the same" reasonableness analysis originally set forth in *Jacobson* would apply "to an emergency restriction on gathering in large groups for public worship during an epidemic." *In re Abbott*, 954 F.3d at 778 n.1, 786.

*South Bay I* and *Abbot* illustrate that when the Governor imposed his strictest numerical limits on indoor worship, the controlling authorities held that the constitution *allowed* such restrictions provided that they "have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *In re Abbott*, 954 F.3d at 784–85 (quoting *Jacobson*, 197 U.S. at 31). As explained in the Court's original November 10 dismissal order, indoor capacity limits are plainly related to stopping the spread of COVID-19. Moreover, such temporary emergency restrictions are not so unconscionable that they are "beyond all question, a plain, palpable invasion of rights secured by the [Free Exercise Clause]," *id.*, especially in light of Supreme Court *and* Fifth Circuit precedent counseling the opposite. *See Prince*, 321 U.S. at 166–67 ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *In re Abbott*, 954 F.3d at 778 ("'[U]nder the pressure of great dangers,' constitutional rights may be reasonably restricted 'as the safety of the general public may demand.' That settled rule allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home."

(quoting *Jacobson*, 197 U.S. at 29)).

In short, when the Governor issued his strictest limits on indoor worship in March 2020, it was not at all clear that he acted unconstitutionally. Quite the opposite: controlling authorities indicated that the Governor's crowd limits *were* constitutional. Even if, ultimately, the Governor's judgment was "mistaken," it was well supported by existing law, and therefore "reasonable." *See al-Kidd*, 563 U.S. at 743. Governor Edwards is plainly entitled to qualified immunity for his most restrictive (10-person) limits on indoor worship services set forth in the Stay-at-Home Orders. *Id.*

It follows that the Governor's *less* restrictive limits implemented in the ensuing months were also "reasonable," and therefore also shielded by qualified immunity. In fact, the *first* signal that indoor capacity limits on religious assemblies were presumptively unconstitutional unless they passed strict scrutiny did not arrive until November 25, 2020, when the Supreme issued its *Roman Catholic Diocese of Brooklyn* opinion. But even that case did not clearly establish the "right for [Plaintiffs'] entire congregation to meet in person in the church building." (Doc. 121 at 12). True, the Supreme Court enjoined New York's 10- and 25-person indoor occupancy limits against religious congregations; at the same time, however, the Supreme Court expressly *endorsed* "maximum attendance … [limits] tied to the size of the church or synagogue." *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 67. When *Roman Catholic Diocese of Brooklyn* was decided, Louisiana's 10-person indoor occupancy limit was obsolete, having expired *six* months earlier, on May 15, 2020. Rather, in

November 2020, Governor Edwards' Proclamations allowed Louisiana congregations to operate at 75% occupancy—*i.e.*, a maximum attendance limit "tied to the size of the church or synagogue." Thus, even after *Roman Catholic Diocese of Brooklyn*, it was reasonable for the Governor to believe that Louisiana's effective 75% occupancy limit was constitutional under existing law.

Two months later, on February 5, 2021, the Supreme Court issued *South Bay II*. But, again, this opinion fell well short of clearly establishing a right to unfettered religious assembly. *South Bay II* enjoined California's ban on *all* indoor religious assemblies, but expressly *denied* injunctive relief "with respect to … percentage capacity limitations" on religious services, specifically stating that California was "not enjoined from imposing a 25% capacity limitation on indoor worship services." *South Bay II*, 141 S. Ct. at 716. In February 2021, Governor Edwards' Proclamations allowed Louisiana congregations to operate at 75% occupancy. *South Bay II's* express endorsement of a 25% capacity limit made it reasonable for the Governor to believe that a 75% capacity limit was also constitutional.

*All* crowd-size restrictions on religious assembly in Louisiana expired on March 1, 2021. The Supreme Court did not issue its decision in *Tandon* until April 9, 2021, five weeks later. But even *Tandon* does not clearly endorse the unbridled right to assemble that Plaintiffs seek. In fact, *Tandon* contemplates that the State *may* still impose capacity limits on religious assemblies, provided that such limits satisfy strict scrutiny. *Tandon*, 141 S. Ct. at 1296.

In sum, there is not now, and never has been a "clearly established"

constitutional "right for [Plaintiffs'] entire congregation to meet in person in the church building." (Doc. 121 at 12). Moreover, as illustrated above, for the *entire* period encompassed by the Governor's gradually decreasing restrictions on indoor worship, controlling authority counseled that the effective indoor crowd-limits in place at any given time *were* constitutional. Accordingly, even assuming that Plaintiffs have stated an actionable Free Exercise Clause claim, the Governor is entitled to qualified immunity for any and all unconstitutional acts forming the basis of such claim, and all claims for damages against the Governor must be dismissed.[7]

### b. Chief Corcoran and Sheriff Gautreaux

It follows that Chief Corcoran and Sheriff Gautreaux are also entitled to qualified immunity for their enforcement of the Governor's indoor capacity limits. "Police are charged to enforce laws until and unless they are declared unconstitutional," *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979), and "an arrest made in good faith reliance on a statute not yet declared unconstitutional is valid regardless of the actual constitutionality of the ordinance." *United States v. Carden*, 529 F.2d 443, 445 (5th Cir. 1976). The Governor's Proclamations were issued pursuant to his executive authority under the Louisiana Homeland Security and

---

[7] In reaching this conclusion, the Court does not consider what impact, if any, the Governor's statewide mask mandate would have on the analysis. Plaintiffs' opposition fails to brief the issue, and therefore it is waived under the Court's Local Rules. *See* M.D. La. LR 7(d); *see also Gray v. City of Denham Springs*, No. 19-cv-00889, 2021 WL 1187076, at *5 (M.D. La. Mar. 29, 2021) (Jackson, J.) ("The Court will not speculate on arguments that have not been advanced, or attempt to develop arguments on [a party's] behalf." (quotation marks and alterations omitted)).

Emergency Assistance and Disaster Act, La. R.S. § 29:721, *et seq.*, and the Louisiana Health Emergency Powers Act, La. R.S. § 29:760, *et seq.*, and have the full force and effect of law. La. R.S. § 29:724(A). At no point were the Governor's Proclamations declared unconstitutional. Accordingly, when they acted to enforce the Governor's crowd-size limits, Chief Corcoran and Sheriff Gautreaux each reasonably believed that they acted pursuant to valid laws. Thus, Chief Corcoran and Sheriff Gautreaux are each also entitled to qualified immunity, and all claims for damages against them must be dismissed.

### C. State Law Claims

Once again the Court has dismissed all federal claims. Accordingly, there is no basis to exercise federal question jurisdiction, and the Court must decide whether to maintain jurisdiction over Plaintiffs' pendant state law claims. In making this determination, the Court "look[s] to the statutory factors set forth by 28 U.S.C. § 1367(c), and to the common law factors of judicial economy, convenience, fairness, and comity." *Enochs v. Lampasas Cty.*, 641 F.3d 155, 159 (5th Cir. 2011). "When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999).

Here, all factors favor dismissing Plaintiffs state law claims. These remaining claims raise novel issues of Louisiana law—specifically whether the Louisiana Constitution protects Plaintiffs from the Governor's crowd-size limits—and obviously predominate over the nonexistent federal claims. *See Enochs*, 641 F.3d at 159. Moreover, judicial economy, convenience, fairness, *and* comity are each served by allowing Louisiana's courts to address Plaintiffs' state law claims in the first instance,

32

particularly because as the Louisiana Supreme Court has recently issued a supervisory writ granting review of Pastor Spell's challenge to the misdemeanor summonses issued under the Governor's Proclamations. *See State v. Spell*, 2021-00876 (La. 12/7/21), 2021 WL 5801052. The issues presented in Pastor Spell's state court criminal proceeding necessarily overlap with those presented here, and are deserving of a state court adjudication unencumbered by a parallel federal civil proceeding.

Accordingly, the Court will follow the "general rule" and also dismiss all of Plaintiffs' state law claims. *Bass*, 180 F.3d at 246.

### III.    CONCLUSION

Accordingly, consistent with the reasoning set forth herein,

**IT IS ORDERED** that Sheriff Sid Gautreaux's **Second Motion To Dismiss Plaintiffs' First Amended And Supplemental Complaint, appearing as Doc. 117 in Civil Action 20-cv-00282-BAJ-EWD,** be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Chief Corcoran's **Second Motion To Dismiss Pursuant To Rule 12(b)(6), appearing as Doc. 118 in Civil Action 20-cv-00282-BAJ-EWD,** be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Governor Edwards's **Motion To Dismiss Plaintiffs' First Amended And Supplemental Complaint On Remand From Fifth Circuit, appearing as Doc. 119 in Civil Action 20-cv-00282-BAJ-EWD,** be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Chief Corcoran's **Motion To Dismiss Pursuant To Rule 12(b)(6), originally appearing as Doc. 10 in Civil Action**

**21-cv-00423-BAJ-EWD,** be and is hereby **GRANTED**.

IT IS FURTHER ORDERED that Sheriff Gautreaux's **Motion to Dismiss, originally appearing as Doc. 11 in Civil Action 21-cv-00423-BAJ-EWD,** be and is hereby **GRANTED**.

IT IS FURTHER ORDERED that Governor Edwards's **Motion To Dismiss, originally appearing as Doc. 13 in Civil Action 21-cv-00423-BAJ-EWD,** be and is hereby **GRANTED**.

IT IS FURTHER ORDERED that all federal claims set forth in Civil Actions 20-cv-00282-BAJ-EWD and 21-cv-00423-BAJ-EWD be and are hereby **DISMISSED WITH PREJUDICE**.

IT IS FURTHER ORDERED that the Court declines to exercise supplemental jurisdiction over any state law claims set forth in Civil Actions 20-cv-00282-BAJ-EWD and 21-cv-00423-BAJ-EWD and that all such state law claims be and are hereby **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c).

A final judgment will be entered separately.

Baton Rouge, Louisiana, this 12th day of January, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

34